### Barker v. Commonwealth.

(Decided May 28, 1914.)

Appeal from Garrard Circuit Court.

Instructions—Evidence to Sustain.—The court should not give an instruction upon a theory of the case that is without evidence to sustain it.

JAMES I. HAMILTON, LEWIS L. WALKER and HAZELRIGG & HAZELRIGG for appellant.

JAMES GARNETT, Attorney General, D. O. MYATT, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE MILLER—Reversing.

The appellant, Robert L. Barker, was indicted for the murder of his brother-in-law, John Eason; he was convicted of manslaughter, and having been sentenced

to serve a term in the State penitentiary of from two to twenty-one years, he appeals.

Appellant assigns two grounds for a reversal: (1), that the judgment is not supported by the evidence, and (2), that the court improperly instructed the jury.

Eason had married a sister of appellant; and until about three days before the homicide appellant and Eason were friendly with each other. Appellant's wife had died a few months before, leaving a daughter about sixteen years of age, two small boys, and a baby boy about three months old. Appellant and Eason lived only a short distance from each other, and appellant arranged with his sister, Mrs. Eason, to take and care for the baby for him, for which he was to pay her $100 a year, and to furnish the milk for the child. The milk was furnished twice a day and was usually delivered by appellant. Eason had living with him a nephew named Homer Luster, about nineteen years of age, who had attempted to pay some attention to appellant's oldest daughter. Appellant objected to these attentions upon the part of Luster, assigning the youth of Luster, as well as the tender years of his daughter as the grounds of his objection. No hard feelings seem to have resulted from this incident, however, although appellant shortly thereafter sent his daughter to a boarding school at Richmond, Kentucky.

While the daughter was in school at Richmond she began a correspondence with Luster, she having written the first letter. In order to prevent a discovery of the prohibited correspondence it was agreed between them that she would direct her letters to Mrs. Eason and would place a cross-mark on the envelope of every letter that was intended for Luster. This scheme was carried out for several months, Mrs. Eason at least knowing it, if not participating therein. Mrs. Eason and Luster also testified that it was known to Eason. On Thursday before the homicide, which occurred on Sunday, Barker went to the postoffice and received the mail addressed to Mrs. Eason. It consisted of two letters and a card, all being addressed to Mrs. Eason and in the handwriting of Barker's daughter. Suspecting that the letters were intended for Luster, Barker opened them, and his suspicions were confirmed. The letters contained nothing derogatory, however, to the character of any one; they were simply love letters from his

daughter to Luster. When Barker went to Eason's house that evening to deliver the milk for his baby he went in the back way, and having left the milk in the kitchen, he then went forward into a front room, and after speaking to those present in the usual way, told his sister the milk was in the kitchen. When Mrs. Eason went into the kitchen to prepare the milk, Barker followed her and handed her the post card from his daughter, saying that it was given out with his mail, through mistake. Mrs. Eason read it and told Barker it was from his daughter. Barker said nothing to Mrs. Eason as to the two letters intended for Luster and which he had opened that afternoon.

There is considerable contradiction as to what was said by Barker and by Mr. and Mrs. Eason immediately after Barker had delivered the post card to his sister. Mrs. Eason testified that Barker said people were meddling with his affairs and his daughter at Richomnd; whereupon Eason spoke up and said they were not meddling with his affairs; and that Barker in turn said that he would kill the man that meddled with his affairs. She says Barker further said he was going to Richmond to see about this letter business, and repeated that he would kill the man that meddled with his affairs, and that when he got back from Richmond hell was going to be to pay.

According to Barker, when he and his sister had gone to the kitchen he told her that someone was meddling with his daughter in Richmond and in somebody's name, and that she denied it; that he told her how interested he was in his daughter; that his friends had offered to furnish him the money to send her to school; and that at this point John Eason came in and the quarrel began, Eason saying that there had been a pack of damn lies told about these letters all winter. Barker also says that Eason said, "We will get you, we will burn hell with you," and that John Eason and his other relations who were present, including Luster, made such demonstrations towards him that he believed they were prepared to take his life, and for that reason he procured a pistol. Up to that time he had never owned a pistol.

Barker did not go back to the house to take the milk to his baby, but sent it by his boy on Friday, Saturday and Sunday. Elmer Lantem, a cousin of Homer Luster, testified that on Saturday afternoon he invited Luster to go home with him and spend Sunday, and that Luster

told him he could not go because he was expecting trouble. Luster admits he was with Lantem on Saturday, but did not remember whether he made the statement attributed to him by Lantem; he did not, however, deny it.

Barker was the trustee of the school district, and as he was custodian of the key to the schoolhouse, he had been requested to open the schoolhouse on Sunday afternoon for the purpose of holding religious services therein. When Barker arrived at the schoolhouse he found a small crowd of men and boys gathered there, including Eason and Luster. After Barker unlocked the schoolhouse door he went to the home of his sister, Mrs. Humphrey, which was nearby, to get a drink of water; and when he returned to where the crowd was standing near the schoolhouse door he saluted Eason by saying, "John, how is my baby?" to which Eason replied, "Very well." Barker then asked Eason if he could have a conversation with him, or words to that effect, to which Eason made no reply but started walking off with Barker—side by side. Barker says he told Eason that he wanted to speak to him about his daughter, and referred to the fact that Eason had a wife and little children and that Barker also had some children; that Eason knew Barker was very much interested in his daughter; that it cost him a good deal of money to send her to school, and suggested that they ought to be friends, and asked Eason if he would please not have any more letter writing done at his house. Barker says Eason did not accept this in the spirit in which it was said, but immediately became enraged and said to Barker, "What we are doing is none of your damn business"; that Barker said, "Yes, it is"; whereupon Eason responded, "You God damn son of a bitch, I will knock the hell out of you," and jumped around, drew his pistol from his left pocket and fired from under his coat at Barker. Barker then struck Eason with his left hand and pulling his pistol from his right pocket fired five times at Eason, killing him almost instantly. Immediately after firing Barker made an exclamation, which has been differently reported by the witnesses. Some of them say that Barker then said in substance, "There is another son of a bitch here and I would like to see him," or words to that effect; while other witnesses testify that Barker said, "There is another son of a bitch here that wants to take my life,

but I don't see him." Sherrow, a witness for the Commonwealth, testified that Eason said to Barker after the shooting, "Bob, you killed me for nothing." No other witness testified that Eason made that, or any other statement after he was shot. There were about twenty-five people at the schoolhouse and the shooting occurred ninety feet from the crowd. Barker's version of the difficulty to the effect that Eason fired the first shot is positively corroborated by seven witnesses, while no witness testified that Barker fired the first shot. Sherrow is the only witness who does not say that Eason fired the first shot; he says that when he first saw the difficulty Eason and Barker were striking at each other, and that he did not see Eason shoot. This testimony of Sherrow does not, however, contradict the testimony of the other seven witnesses who say Eason fired the first shot, and that the parties then struck at each other before Barker fired; it only shows that Sherrow did not see the beginning of the difficulty. His testimony is not at all inconsistent with the testimony of the other witnesses.

It further appears, without contradiction, that Barker's character as a sober, peaceable, law-abiding citizen is without reproach. Neither party was drinking and it is not shown that either of them was given to drinking.

Under this testimony the court gave seven instructions, the complaint of appellant being, however, confined to the fifth and sixth instructions, on self defense, which read as follows:

"5. If you believe from the evidence that at the time the defendant, Robert Barker, shot at and wounded John Eason so that he died thereby, if he did so do, he believed and had reasonable ground to believe that he was then and there in danger of death or of the infliction of some great bodily harm at the hands of John Eason, and that it was necessary, or was believed by the defendant, in the exercise of a reasonable judgment to be necessary to shoot and wound the deceased in order to avert the danger, real or to the defendant apparent, then you ought to acquit the defendant upon the ground of self defense or apparent necessity therefor.

"6. If you should believe and find from the evidence beyond a reasonable doubt that the defendant armed with a deadly weapon sought out the deceased for the

purpose of engaging in a difficulty with the deceased for the purpose of killing or injuring him and with the intention of bringing on the difficulty for the said purpose slapped or struck the deceased when he was in no danger himself and believed himself to be in no danger, at the hands of the deceased, and did thereby bring on the difficulty in which the deceased was killed, and that the defendant willingly entered into the conflict with said Eason and willingly engaged in same up to the time he fired the fatal shot or shots that took from him, the deceased, his life (if you believe he did so) then in that event the defendant could not be justified on the grounds of self defense and apparent necessity therefor. Unless the jury should believe that the defendant had abandoned in good faith his intention to so bring on the difficulty for said purposes (if they believe he had such an intention and did so) and withdrew in good faith from the conflict (if they believe he entered into the same willingly with the deceased) before he shot the deceased (if they believe he did so)."

Appellant claims that the instruction upon self defense should have closed with the fifth instruction, and that the sixth instruction should not have been given for the reason that there was no evidence to support it. There certainly is no evidence tending to show that Barker slapped or struck Eason when he was in no danger himself, or with the intention of bringing on the difficulty. The evidence of seven witnesses shows that Barker slapped or struck Eason only after Eason had fired the first shot; and as we have above shown, no witness testified to the contrary, since Sherrow, the only other witness upon that question, says they were striking each other before Barker fired, but he does not know which one struck the first blow.

We are advised that the trial court based the sixth instruction upon the authority of Harris v. Commonwealth, 140 Ky., 41. In that case, however, there was some evidence upon which to base the instruction. The objection is not to the form of the instruction; it insists that the instruction should not have been given at all for the want of evidence to support it. We think the criticism is well taken and that the sixth instruction should not have been given. Chaplin v. Commonwealth, 142 Ky., 788; Gamble v. Commonwealth, 151 Ky., 372.

Furthermore, upon another trial, the fifth instruction, instead of permitting Barker to shoot and wound Eason under the facts therein predicated, should follow the usual language of such instruction which permits the defendant to shoot and kill his opponent under the circumstances predicated in the instruction.

As this case will have to be tried again we express no opinion upon the first ground of error relied upon by appellant, that the verdict is not sustained by the evidence.

Judgment reversed for a new trial.