### Shrout v. Commonwealth.

(Decided June 14, 1916.)

### Appeal from Nicholas Circuit Court.

1.  Criminal Law—Evidence.—Evidence examined and the verdict held not to be palpably against the evidence.
2.  Criminal Law—Insulting Language—Self Defense.—One who uses insulting language in a sudden affray, which comes up unexpectedly and at a casual meeting of the parties, should not be deprived of the right of self defense because of the use of such language when he had been guilty of no overt act indicating a purpose to attack his adversary.

HOLMES & ROSS, JOHN P. McCARTNEY, WILLIAM CONLEY, and F. V. COX for appellant.

M. M. LOGAN, Attorney General, and CHARLES H. MORRIS, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE TURNER.—Reversing.

At the February term, 1916, of the Nicholas circuit court appellant was indicted charged with the murder of his brother, Jesse Shrout. At that term a trial was had and the jury failed to agree, but in May following another trial was had and the jury found him guilty of manslaughter and fixed his punishment at confinement in the penitentiary for not less than sixteen years nor more than sixteen years and one day. Judgment having been entered on that verdict and his motion for a new trial overruled he has appealed.

Only two grounds are urged for reversal:

First. That the verdict is palpably against the evidence and appears to have been the result of passion and prejudice.

Second. That the court erred in giving instruction No. 6 qualifying the right of the defendant to rely upon the plea of self defense.

As there must be another trial of this case we shall only state so much of the evidence as will enable us to intelligently pass upon the two questions made, and will not undertake to discuss the weight or the effect of the evidence except in so far as it may be necessary to pass upon these questions.

John and Jesse Shrout were brothers, the sons of James Shrout, Sr., and they each were farmers and lived in Nicholas county, John being about fifty years of age and Jesse forty-three. John owned a small tract of land which was adjoined by a tract owned jointly by Jesse and his father-in-law Borders; the fence between these two tracts of land was in bad repair. John had on his land some hogs; and late in the afternoon on the fourth of January, 1916, John and Jesse met, and Jesse complained of John's hogs being on his land, and told him if he did not keep them off he was going to have him arrested, whereupon John told him he was ready to divide the fence and fix his part of it, and there is some difference in the evidence as to whether Jesse at the time agreed to this, John stating in his evidence that he did agree to it, and another witness who was present stating that Jesse said he had already contracted to sell the tract of land and was to give possession the first of March following and could not afford to go to the expense of fixing the fence. At any rate, there is nothing in the evidence to indicate that there was any bad feeling between the parties at that time, although Jesse threatened to

have John arrested if the hogs were not kept out, and John on the other hand proposed that they divide the fence at once and fix it so that the hogs could not get through.

Up to the time of this interview between the two brothers there is nothing in the record to show that they had ever at any time had a disagreement or difference of any nature.

A little before, or about daylight on the next morning, January 5th, appellant went to the home of his father, James Shrout, only a short distance from his own home, and was joined there by his father, and together they started to the father's tobacco barn for the purpose of stripping tobacco, the barn being on the place or near the house where Jesse lived; John and his father had been stripping tobacco in this barn for the last eight or nine days before; when they were about halfway from James Shrout's home to the tobacco barn near Jesse's house they met in the road Jesse Shrout and Albert Shrout, the latter a grandson of James Shrout and a nephew of John and Jesse. When the parties met Jesse said to his father that he thought he was going to take his tobacco off that day, and the old gentleman responded that it looked like rain and he did not have a tarpaulin; then John said to Jesse he was ready to fix that fence, and Jesse said he could not do it because he had sold the land and did not want to go to the expense; John then said that he would see that he did do it, and Jesse said that he wouldn't, and Jesse told him if he found his hogs on there again he was going to town and have him arrested, whereupon John told him that if he was that kind of a man that he did not want to have anything else to do with him, and that hereafter just pass him by like he would pass a hog, and further that he wanted him to quit trespassing on his property, and Jesse told John to pass him by and not to speak to him; about that time Jesse said to John that he knew he had a gun and to keep his hand off his gun, and John said he was just buttoning up his pants or overalls; Jesse further said to John he knew he had a pistol but that he was not afraid of his pistol and to go on off as he did not want to have any trouble with him, and then they both started off, Jesse going in one direction and John in another; after Jesse had gone some distance and John a short distance the word "son-of-a-bitch" was used by one or the other of them, John

saying it was Jesse and the old man saying that he thought it was John; just after the use of this epithet Jesse turned and stooped down as if to get a rock and rushed on John, John at the time backing away as Jesse came upon him, but Jesse rushed on him quickly and they clinched, Jesse striking at John just before he got to him and John was seen to dodge; licks were passed between them and they were soon down in the ditch in the edge of the road, Jesse on top of John; the old man, John and one other witness on horse back, who witnessed at least a part of the trouble, say that the one shot which was fired was after they were down and while Jesse was on top of John, while Albert Shrout, the young man who was with Jesse and Howard Shrout, the ten-year-old son of Jesse Shrout, who claims to have been present, say that the shot was fired about the time they clinched and while they were both standing in the road, but after Jesse had either thrown a rock at John or struck at him with a rock in his hand. John testifies that Jesse first knocked him to his knees with a rock in his hand and then with another stroke knocked him down and jumped on him and was beating him over the head with the rock in his hand and that he turned his head to avoid the blows, and Jesse hit him as many as three or four times with the rock on the back of his head, and that it was not till then he shot; and in these statements he is corroborated by the testimony of physicians showing the injuries to his ear on one side of his face and cuts and bruises on the back of his head. The course of the bullet and the fact that Jesse's vest was on fire from the shot immediately afterwards are other facts relied upon to bear out the defendant's version.

On this statement of the evidence it is apparent that the case was properly submitted to the jury; it is admitted by the appellant that he fired the shot and there is considerable conflict in the evidence as to the exact circumstances under which he fired it, and we are unwilling to say that the verdict is flagrantly against the evidence or that it is not sustained by the evidence.

The court in instruction No. 5 gave the self defense instruction, and then immediately gave instruction No. 6 qualifying it as follows:

"If you believe from the evidence beyond a reasonable doubt that the defendant with the intent to shoot the deceased in a conflict or difficulty with him, and for the

purpose or with intent to bring on a conflict or difficulty with the deceased used insulting language toward him which was reasonably calculated to bring on a conflict or difficulty and which did bring on a conflict or difficulty, then in that event the defendant cannot avail himself of the plea of self defense or apparent necessity, unless he in good faith abandoned his intention and withdrew from the conflict or difficulty before the fatal shot was fired."

It is apparent from this statement of the evidence that the meeting between the brothers was casual; there is nothing in it to suggest the idea that the appellant armed himself and sought out the meeting for the purpose of having a difficutly. He was going to his place of work where he had been engaged for a number of days; he was going on the regular route to that place; he had gone by his father's home so that he might accompany him, and it is inconceivable that if he had armed himself and was searching for his brother for the purpose of having a personal difficulty and killing him that he would have gone by his father's home and procured him to go with him as a witness.

But when the brothers did meet an angry quarrel, evidently not expected by either of them, suddenly developed and they each used in their anger such language as should not be passed, especially between brothers; each of them told the other not to speak to him again; one of them told the other not to trespass upon his land, and the other threatened him with arrest if he did not keep his hogs off of his property, and at the same time declined to repair his part of the line fence. We can make nothing out of this except a sudden affray growing out of an unexpected meeting and the exhibition of temper on both sides.

The question is, should a man using insulting language in an angry quarrel which comes up unexpectedly, be deprived of the right of self defense because merely of the use of such insulting language when he has not attacked his adversary and when he has been guilty of no overt act indicating such purpose?

The case of Gambrill v. Commonwealth, 130 Ky. 513, relied upon by the Commonwealth, is in no sense similar to this case; in that case a conspiracy was charged and there was evidence to sustain it, and the court held merely that where two or more combined to kill another and pursuant to such conspiracy seek him and kill him, or

provoke an assault and then kill him, the conspirators cannot rely upon the plea of self defense; but it was further held that even though the decedent was killed pursuant to such conspiracy and while it existed if no one of the conspirators sought him out for the purpose of killing him or provoking the difficulty resulting in his death, or first attacked him, then any one of the conspirators would be entitled to rely upon the plea of self defense.

Likewise the case of Harris v. Commonwealth, 140 Ky. 41, has no application; in that case the defendant sought to force his attentions upon a young lady, and when rebuffed continued to follow her and other young people with whom she was going along the road and when he overtook them indulged in the use of profane and provoking language for which he was upbraided by the escort of the young lady; the escort dropped back and in an altercation following between him and the defendant was shot three times, once in the back, and the court held that as there was evidence showing that he had followed the young people and had used insulting and provoking language the instruction in that case was properly given.

It is a most serious thing to deprive a man of the right of self defense, and under the facts of this case we do not think it was justified; the meeting was casual, the difficulty arose suddenly and unexpectedly, and what was said and done there was in the heat and passion of the moment, and under such circumstances the use of the epithet involved should not deprive one of the right of self defense, however much the use of such language is to be condemned. Chaplin v. Commonwealth, 142 Ky. 788; Barker v. Commonwealth, 159 Ky. 304; McGowan v. Commonwealth, 117 S. W. 387.

The usual self defense instruction sufficiently presented the issue in this case, and the qualifying instruction No. 6 should not have been given.

For the error indicated the judgment is reversed, with directions to grant appellant a new trial and for further proceedings consistent herewith.