## STATE v. ARAGON
(No. 1579; Mar. 10, 1930; 285 Pac. 803)

310

The cause was submitted on the brief of *G. J. Christie*, of Lander, Wyoming.

On behalf of the State, there was a brief by *William O. Wilson,* Attorney General; *James A. Greenwood,* Deputy Attorney General, and *P. S. Garbutt,* Assistant Attorney General, of Cheyenne, and oral argument by *Mr. Wilson* and *Mr. Garbutt.*

BLUME, Chief Justice.

On information filed in the District Court of Fremont County, charging him with the murder of one Jesse Large, the appellant, Charles Aragon, was tried and convicted of murder in the first degree and sentenced to suffer the penalty of death. From this sentence an appeal has been taken to this court. We shall review most of the assignments of error, though not all, since some of them are so clearly not well taken that it is unnecessary to mention them.

■ A preliminary hearing was had in the case on September 11, 1928, before a justice of the peace. The justice filed a certified copy of his docket entries in the District Court. These entries show that an information was filed before the justice charging the defendant with the crime of murder in the first degree; that the defendant was brought before him; that he pleaded not guilty, and that a hearing

was had. Then follows the finding of the justice in the following words:

"The court, after due consideration of the evidence given, it is by the court ordered and directed that the defendant Charles Aragon be held without bail in the county jail at Lander, Fremont County, State of Wyoming, there to abide until called to trial in the District Court in the fall term of 1928."

It is argued that the justice did not find that any crime was committed for which the defendant was held and that the District Court, accordingly, did not acquire jurisdiction to try the case. This objection, if valid, could have been raised by a plea in abatement, which was not done. It was raised for the first time in the specifications of error on appeal to this court. In 16 C. J. 345 it is stated that objection to the preliminary complaint or warrant, or the objection that no preliminary examination was had, or that it was invalid, or not properly certified, must be raised before plea of not guilty and trial, and in 16 C. J. 346 it is stated that such objection should be raised by motion to quash or plea in abatement. That, too, is the effect of McGinnis v. State, 16 Wyo. 72, 91 Pac. 936, and James v. State, 27 Wyo. 378, 196 Pac. 1045. Section 7487 Wyo. C. S. 1920, provides that:

"The accused shall be taken to have waived all defect which may be excepted to by a motion to quash or a plea in abatement * * * by pleading not guilty."

The objection now made comes within the contemplation of this statute and must be held to have been waived when, without raising it, the defendant entered his plea of not guilty in the District Court. State v. Calkins, 21 S. D. 24, 109 N. W. 515. Almost the exact point was involved in the case last cited. The case of Boulter v. State, 5 Wyo. 236, 39 Pac. 883, is not in point for the reason that the objection arising out of the preliminary examination was in that case raised by a plea in abatement.

■ On the date set for the trial of this case, the defendant filed a motion for a continuance on the ground of the absence of witnesses who had been attempted to be subpoenaed, but had not, on account of the inclement weather, been able to be reached, or who, on account of sickness, were unable to attend court at that time. It was shown that one of these witnesses, Pedia, would, if present, testify that about January 1, 1928, he was present when the deceased displayed a gun and threatened to kill the defendant but that the people who were present prevented him from doing so; that another of these witnesses Lucille Stagner, would, if present, testify to substantially the same effect; that Eva Wesaw, another of these witnesses, would, if present, testify that on numerous occasions between September 1, 1927 and September 1, 1928, she heard the deceased threaten to shoot and kill the defendant; that another of these witnesses, Claude Baldez, would, if present, testify that the deceased on numerous occasions threatened to kill him and the defendant. Thereupon the county attorney admitted in effect that the witnesses mentioned would, if present in court, testify as claimed. The court then overruled the motion for continuance and this is assigned as error. The only case cited in support of the assignment of error is Parker v. State, 24 Wyo. 491, 161 Pac. 552, which does not seem to have any application. Section 6416, Wyo. C. S. 1920, provides that if a motion for continuance is filed and the materiality of the expected evidence of absent witnesses and the use of due diligence, etc., is shown, the case nevertheless shall not be postponed on account of the absence of such witnesses if the adverse party will admit on the trial that they will testify to the facts stated in the affidavit as true. See McNeally v. State, 5 Wyo. 59, 36 Pac. 824. This admission was made in the case at bar. And while we need not say that such fact will always authorize the court to deny a motion for continuance in criminal cases, we think that in the case at bar the ruling of the court was not erroneous. The affidavits stating the

expected testimony of the absent witnesses were duly admitted in evidence and read to the jury. The facts to which the witnesses were expected to testify were largely merely corroborative of testimony of other witnesses, relating to threats and hostile demonstrations made by the deceased against the life of the defendant. These threats and hostile demonstrations were relevant only as bearing upon the plea of self-defense and the mental attitude of the deceased at the time of the murder. Durham v. State, 29 Wyo. 85, 210 Pac. 934. The facts of the case, which will be hereafter more fully shown, were such that we feel satisfied that the result in this case would not have been changed if the oral testimony of the absent witnesses, instead of the affidavits above mentioned, had been introduced in evidence.

■ The court, among others, gave Instruction No. 20, reading as follows:

"The court instructs the jury that in ordinary criminal cases the jury are required not to take into consideration the punishment which the defendant may receive if convicted. However, the charge in this case includes murder in the first degree, murder in the second degree and the crime of manslaughter. In the event that you shall find by your verdict that the defendant is guilty of murder in the first degree, you may add to your verdict the words 'Without capital punishment,' if you shall find and determine that the defendant, although guilty, should not receive capital punishment, in which event you will use the form of verdict containing such expression."

It is claimed that this instruction is erroneous because "nowhere in said instruction is the jury informed that unless they add the words 'without capital punishment' it is incumbent upon the court to pronounce the death penalty," and "that the jury should have been instructed that in case they did not use such form of verdict no discretion was left to the court." Parker v. State, supra, is relied on. In that case an instruction was given which left the jury to infer that if they did not qualify their verdict by adding the

words mentioned, it was within the power of the court in its discretion to impose either the death penalty or life imprisonment. But the instruction in the case at bar bears no such interpretation. It specifically told the jury to add the clause mentioned if they determined that the defendant should not receive capital punishment. So far as it went, in any event, the instruction was correct, and it is generally held that an instruction which, so far as it is given is not wrong, will not be held erroneous, in the absence of a request for an additional instruction, merely because it is not more full and comprehensive. Bissot v. State, 53 Ind. 408; Achey v. State, 64 Ind. 56, 62; State v. Schiller, 70 Ohio 1, 70 N. E. 505. No additional instruction was asked in the case at bar. We do not think that the jury were misled as claimed, particularly in view of the evidence in the case and the further fact that during the examination of the jury they were given to understand their duty in respect to their verdict, if they should find the defendant guilty of murder in the first degree.

■ Error is assigned because the State was permitted, while examining the members of the jury, to ask whether they had conscientious scruples against inflicting the death penalty, if the law and the evidence warranted it. There is no merit in this assignment of error. Section 7504, subd. 3, Wyo. C. S. 1920, provides as a ground for challenge in a criminal case that the juror's opinions are such as to preclude him from finding the accused guilty of an offense punishable with death. That provision was enacted before the amendment of our statute permitting the jury to fix the penalty for first degree murder at life imprisonment by adding to their verdict "without capital punishment." But it is generally held that even under such a statute a juror may be challenged for cause, if he has conscientious scruples against the punishment of death. 35 C. J. 355. We need not, however, determine that point here, since it does not appear that any juror was challenged or dismissed for cause on account of such scruples, and we merely go so far as to

hold that it was not error to ask the juror the question mentioned in order to determine his bias, prejudice and general qualifications.

■ It is claimed that the prosecuting attorney was guilty of misconduct in his argument to the jury. Complaint is made of a number of statements. Among these was the following: "Gentlemen, I put myself in place of the 13th juror and explain to you why, if I were the 13th juror, I would return a verdict of murder in the first degree." The jury were instructed to disregard the statement, but notwithstanding that, counsel argues that it was prejudicial. We do not think so. Simply because the prosecuting attorney put himself in place of the 13th juror instead of arguing as prosecuting attorney would be wholly immaterial. We may presume, since nothing to the contrary is shown, that he, after making the foregoing statement, proceeded to make the explanation to which he referred; that is to say, that he proceeded to discuss the evidence in the case and attempted to show that it proved the defendant guilty of the crime with which he was charged. In Ross v. State, 8 Wyo. 351, 371, 57 Pac. 924, 927, the prosecuting attorney said to the jury: "I am going to ask you to convict a murderer." We think the statement was at least as strong as the statement in the case at bar, yet this court held it to be without error or prejudice. It was pointed out in that case that while the personal belief on the part of the prosecuting attorney as to the guilt or innocence of the prisoner outside of the evidence has no place in the argument and should not be expressed or suffered to influence the jury, nevertheless, he may ask for a verdict upon the ground that the evidence, in his opinion, shows him to be guilty of the crime with which he stands charged.

Another statement of the prosecuting attorney was as follows: "To enforce the law and bring the criminal to justice means hurting someone. There is no question about it. On the day of the crime, the crowd is all for hanging the prisoner, but four or five months later, or maybe from

the time the criminal case goes to the supreme court and comes back again on appeal, maybe goes up three or four times, the false sympathy of the people is aroused. They are willing to forgive and forget. But that does not improve our situation, gentlemen. That does not help our community any, and that won't make it any safer for you and your wives and children." This statement simply called the attention of the jury to their duty, and we do not perceive how the defendant could have been prejudiced thereby. In Ross v. State, supra, the following argument was used: "If you send him (the defendant) out under such circumstances as these, you say to all in the state that they could do the same as this defendant under like circumstances as did this defendant." That was a much stronger statement than the one in the case at bar, yet the court held it to be without error or prejudice, and said among other things the following:

"If the actual objection is that a jury may not be reminded that their action is not personal, but involves a public duty, and that their attention may not be called to the disastrous consequences to society in case they should render an erroneous verdict in acquitting a defendant who is guilty, then we must withhold our assent from this statement of the law. The penalties assessed against criminals are intended not only as punishment for the particular crime, but also as examples to deter others from the commission of similar offenses. There is no error in calling the attention of a jury to this principle and thus impressing upon them the importance of a verdict of guilty, if the defendant is so proven."

Other statements complained of were as follows: "The evidence shows that the defendant shot at random through the crowd—thank God he didn't have a larger gun." Also: "The testimony is that after shooting Jesse Large the defendant turned his gun on Ed Large and shot him. Now what justification can he give for that act, gentlemen?" These statements, we think, were fairly within the evidence of the case. Defendant shot and killed Ed Large and he

thereafter shot into the crowd and hit a boy. These acts were immediately subsequent to and substantially contemporaneous with the killing of the deceased. They were part of the *res gestae* and showed the state of mind of the defendant at the time. Other statements of the prosecuting attorney need not be mentioned, as they were clearly not prejudicial.

■ It is claimed that the verdict of the jury is not sustained by sufficient evidence. A brief review only of the testimony will be necessary to show the contrary. The deceased, Jesse Large, had been married to one Nellie Large, but was divorced from her about January, 1927. After the divorce the defendant began to associate with Mrs. Large. Deceased was still enamoured of his former wife, and all was not well between the two men. Both evidently continued to pay Mrs. Large attention; the deceased to regain her affection, the defendant to win her for himself and to drive from her heart whatever love there remained for her former husband. In any event, whatever the facts may be in this regard, the record fails to disclose any cause of enmity between the two men except that caused by their relationship to her. A proposal of marriage on defendant's part followed some time during the year, even though Mrs. Large was a number of years older than he. The proposal was turned down. The defendant apparently went away and did not see her for some time. The record fails to disclose any incidents of importance after the proposal of marriage was made, until August, 1928, except that the enmity between the two men continued and except that the defendant had made some remarks about Mrs. Large which displeased her and caused her to write him a letter. The two met in August, 1928, at her home, apparently at Riverton. During the interview the defendant was told that she would have nothing more to do with him, and he, according to her testimony, stated that he would ''get'' the deceased. On September 8, 1928, Riverton held a celebration in commemoration of the early pioneers. A large tent had been

erected in a street in the town. A diagram thereof, together with the various tables therein, was, unfortunately, only drawn on a blackboard in the courtroom and was not copied into the record—a thing which we hope will not again be permitted by any trial court in the state, or by counsel for either party in a suit. The witnesses in testifying pointed to the board, and it is impossible to describe with accuracy the place in the tent in which the unfortunate occurrence here in question took place. There are some inconsistencies in the testimony of the various witnesses, of whom there were many, in minor details, which were to be expected, but the main and material facts are reasonably clear. The tent seems to have been about one hundred feet or more in diameter, with its main entrance in the north, with various tables along the inner circumference and with a dance-hall in the south. About ten o'clock in the evening of September 8, 1928, a large crowd was in the tent. The deceased was standing at one of the tables, apparently facing west— though there is a dispute as to the direction—and he had a pail of lard in his hand. With him were his father, Ed. Large, and Nellie Large, his former wife, with the latter of whom he had been during the whole evening. The three, according to the testimony of the State, were standing at or near the table, conversing peaceably. During that time the defendant entered the tent, went south into the dance-hall, came out again within a short time, moved in the direction of the deceased, walked up behind him, and when within a few feet distant, commenced to shoot at him from the back, firing three shots, two when the deceased was falling, one bullet entering the chest from the rear through the left shoulder-blade; another going through the right arm and into the left lung, and the third striking the rear of the skull, cutting and grazing the scalp, and emerging several inches distant on top of the head. We need not inquire into the order in which the shots were fired or whether all were fired while the defendant was back of the deceased; two probably were, but there is some doubt as to the third.

Immediately thereafter, the defendant also shot and instantly killed Ed Large, the father of Jesse. Then, apparently while facing the north entrance, he shot into the crowd, hitting a boy in the leg, seemingly to open up the way for his escape, for he began to walk toward the north, but was stopped and arrested by by-standers, who took his gun away from him, arrested him and held him until officers of the law arrived to take charge of him. During the shooting the defendant looked wild and after his arrest he stated, according to the testimony of the witness Wooten, "I got them, and I am glad of it." And the city marshal testified that when he informed the defendant that he was under arrest, the latter answered: "All right, take me and do as you please. Take me and hang me. I killed the two sons of bitches I wanted." According to Mr. Burk, however, he also said: "I had to do it; I had to get them or they would get me." The deceased died shortly after the shooting as a result of the wounds inflicted upon him.

The defendant admitted the killing but claimed that he acted in self-defense. Mrs. Hoyt testified that about September 1, 1928, she saw the deceased strike the defendant. William Aragon stated that about January 1, 1928, the two had a "disturbance" at his house. Mr. Yurick testified that in December, 1927, deceased came to the home of the witness, where the defendant then was; that the deceased had a gun with him, which he displayed, and stated that he came to settle with the defendant. The statements of testimony of absent witnesses have already been mentioned. The defendant also produced a witness, William Johnson, who testified that the deceased, about one-half hour before the shooting, asked him whether he had seen the defendant and to tell him, if he saw him, that he, the deceased, wanted to see him; that he thereafter saw the defendant and informed him of what the deceased had said. This testimony, however, was evidently discredited by the jury, among other reasons because he stated that nobody was present when the deceased made the foregoing statement, when, ac-

cording to other testimony, that could not well have been true. The defendant himself testified that previous to the time in question the Larges had told him that they would kill him the next time they saw him; that deceased had at one time shot at him and that he had been told by Lucille Stagner, Eva Wesaw, and Pedia, of threats made against him by the deceased; that on the evening in question Johnson told him that the Larges were looking for him; that he got his gun thereafter because he was afraid of them; that when he saw the deceased the latter made a derogatory statement to him, first facing him, then reaching for his hip pocket as for his gun; that not until then did he shoot deceased, who was at that time "quartering him," that is to say, facing him at an angle; that after the first shot the deceased "slunk down" and came toward him, which made him think that the deceased was going "to grab my feet or something." Dr. Tonkin, however, testified that the course of the bullet showed that the right arm of the deceased was hanging by his side and was not bent as if he had been reaching for his gun. In addition to that it was shown that no gun was found upon the deceased. These, together with other facts, doubtless caused the jury to wholly disbelieve the defendant's testimony as to the necessity for self-defense. It may be, and it is, perhaps, even probable, that the claim of the previous threats of the deceased against the defendant and of his hostile demonstrations was not wholly fabricated, although we are unable to say how much, if anything, of the claim is true. The feeling of the deceased indicated thereby was probably caused, as already stated, by jealousy because of the defendant's association with Nellie Large. No other reason, at least, is indicated in the record. But in August, 1928, the defendant's attentions to her were definitely rejected. On September 8, 1928, the deceased was on a friendly footing with her, and whatever may be the facts testified to by Mrs. Hoyt as happening on September 1, 1928, it is probable that the enmity of the deceased toward the defendant had abated and largely dis-

appeared on the day of the shooting, after he had been informed, as is probable, that the source of the enmity—the attentions of the defendant to Mrs. Large—were at an end. And it would seem that the knowledge which the defendant had was such as to indicate to him, in the nature of things, the probable change of feeling on the part of the deceased. Whatever the truth, however, in this regard may be, the question of self-defense was one for the jury. Even according to the defendant's own story, he deliberately went to the place where the deceased was standing; the shots into the body of the deceased from the rear are ominous witnesses of the truth, and we cannot say that the finding of the jury is not correct. Nor can we hold that jealousy on the part of the defendant, if that was at the root of the killing, as would seem to be true, should reduce the penalty which the defendant should suffer. Jesse Large had the right, if he wished, to seek a reconciliation with his former wife. Natural instincts should have suggested to the defendant that he ought not to interfere, particularly after he himself had been definitely rejected by the woman. And he had ample time to reflect after his rejection. The homicide appears to have been deliberate, nay, seemingly brutal, particularly if the attendant circumstances are considered, and we are not warranted in interferring with the verdict of the jury. We have carefully searched the record for prejudicial errors, as we have been asked to do, but have failed to find any. The defendant had able counsel, who defended him with commendable zeal. The instructions, so far as we can see, fairly presented the law; and the court appears to have taken all possible pains and precautions to give the defendant a fair and impartial trial. The judgment herein must accordingly be and is affirmed. And now this court appoints Friday, the 2nd day of May, A. D. 1930, for the execution of the sentence pronounced in the court below.

*Affirmed.*

KIMBALL and RINER, JJ., concur.