(October Term, 1938)

# STATE v. BRISTOL

(No. 2053; December 5, 1938; 84 Pac. (2d) 757)

For the appellant, there was a brief by *J. R. Sullivan* and *G. R. McConnell* of Laramie and oral argument by *Messrs. Sullivan* and *McConnell*.

For the respondent, there was a brief by *Ray E. Lee*, Attorney General; *Thos. F. Shea*, Deputy Attorney General; and *Wm. C. Snow*, Assistant Attorney General, all of Cheyenne, and a supplemental brief by *Glenn Parker* of Laramie, and oral argument by *Mr. Shea* and *Mr. Parker*.

Supplemental brief for respondent by *Glenn Parker,*
Prosecuting Attorney of Albany County.

BLUME, Chief Justice.

Myron Bristol was tried April 12, 1937, upon an information charging him with murder in the first degree for killing one Wesley Skogerson at Laramie,

Wyoming, on October 30, 1936. The defendant relied upon self-defense. The court directed the jury that they could find the defendant guilty only of second-degree murder, or manslaughter, or find the defendant not guilty. The jury returned a verdict of voluntary manslaughter. Upon this verdict the defendant was sentenced to the penitentiary for a term of from three to nine years. He has appealed, alleging the insufficiency of the evidence to convict, and assigning error in the giving of certain instructions.

The defendant at the time of the killing was 36 years of age, weighing 140 pounds. His regular employment was that of railroad brakeman and conductor; when temporarily out of that service, he was occasionally employed by the Laramie Liquor Store, painting the premises and assisting in rush times at waiting on customers. It seems that, when not so employed, he loitered about the premises, and he was doing so on the evening of October 28, 1936. Somewhere around eleven o'clock of that evening the deceased, Wesley Skogerson, accompanied by Norman Johnson, came into the liquor store. They had been drinking throughout the evening. They went into the "cocktail lounge" of the liquor store, danced with some girls, and returned to the bar, where Skogerson ordered some drinks. These he paid for with a dollar, receiving in change the sum of ten or twenty cents, which he claimed was insufficient change, and he engaged in some altercation with the bartender concerning the alleged short-changing. He was quieted by the bartender's display of a "sap." Skogerson is described as being a large man, six feet and two or three inches in height, weighing 200 pounds or more, and "well muscled." He was evidently in a quarrelsome stage of near-drunkenness. The bartender left the bar to attend to some customers in the cocktail lounge; during his absence Johnson attempted to persuade Skogerson

to leave the place to avoid trouble, and accompanied his persuasion with some force, which Skogerson resisted. Hearing them scuffling, the bartender returned to the barroom and attempted to eject them. He was followed by Bristol, who assisted in the ejection. Later, Skogerson and Johnson returned to the Laramie Liquor Store, where, after apologizing to the bartender for his part in the earlier altercation, Skogerson proceeded verbally to abuse Bristol, ending with the threat to "stomp his face in" when Bristol should leave the store. Skogerson and Johnson then went directly to the Manhattan Cafe and joined two women in the last booth, No. 8, on the west side. A few minutes afterwards Flo Hall, a witness in this case, joined them. It was then about 1:30 a. m.

In the meantime, at the Laramie Liquor Store, Robinson, the bartender, and Bristol, the defendant, had had some desultory conversation, after which Robinson proceeded to lock the place for the night. During a short absence of Robinson from the barroom, Bristol secured his hat and coat from behind the bar, and took from the bar a gun which he found in a drawer, and a bottle of whiskey. These he put into his coat pockets. Robinson returned to the barroom and began to check the cash receipts for the day. After watching him for a few minutes, Bristol proposed to go home. He was invited by Robinson, "stick around a few minutes and we'll go over to the Manhattan and have a bite to eat." Robinson, however, discovered a shortage in his cash, and, Bristol desiring to leave, the bartender told him to "go over to the Manhattan and wait for me there." Whereupon, Bristol left the place. He testified that, fearing Skogerson and Johnson because of their threats, he cautiously inspected the street, but found no one in sight. He then tried to re-enter the liquor store, to return the gun he had taken. He was unable, however, to attract Robinson's attention, and there-

upon left for the Manhattan Cafe. The defendant, so he testified, proceeded somewhat cautiously from the liquor store to the cafe, keeping a lookout for Skogerson and Johnson. The time that it took him to go there is uncertain. He testified:

"I walked by the door first and kind of looked in a little bit, and I turned around on the other side of the door there, and I saw Claudie Thomas and Billie Thomas and Mr. Pritchard and one of his brakemen was there with him, and then there was another fellow that I didn't know. * * * I didn't want to see Skogerson or Johnson any place, and if I had seen them in there I wouldn't have gone in the place."

The state contends that it is altogether improbable that Bristol did not see Skogerson sitting in the cafe. It is not necessary to go into greater detail on this point at this time, except to say that, while the jury were allowed to view the premises, it is not shown that they viewed them under like circumstances as existed at the time of the homicide. Johnson was sitting in the south seat of booth No. 8, facing the rear of the restaurant. Skogerson, sitting beside him on the "arm" of the booth, also faced the rear of the room. Flo Hall sat in the north seat, at the outside, facing the front door. The two "Williams girls" sat next the wall, one in the north, the other in the south seat, neither apparently observing anything. Evidence concerning the lighting of the place is unsatisfactory. The room was 48 feet long. Furniture obstructed the view, so that the point is not clear as to whether a person sitting as Skogerson was, with only his back visible from the front part of the restaurant, would have been recognizable from the street, even if seen. However that may be, Bristol testified that he did not recognize him. He entered the restaurant, walked through to the "short counter" near the rear of the room, and there spoke to Claudie Thomas. He asked Thomas to buy

him a cup of coffee; Thomas refused, pleading that he was broke, and Bristol then offered Thomas a drink of whiskey. "He said," testifies Thomas, " 'Come here, I want to talk to you,' so I got up and we started in the back of the Manhattan there, to the washroom." To get to this room, it was necessary to go into a hall which was north of the last booth where the deceased was sitting. The hall runs east and west; the washroom is a small room to the south of the hall and separated from it by a swinging door. As the defendant walked toward the entrance of the hall, he passed within a few feet of the booth in which was the deceased. The defendant claims that he did not see the deceased. Gilbert, a witness for the state, testified that the defendant stopped momentarily at the booth, although he had on another occasion testified to the contrary. Flo Hall, too, testified that he stopped. She stated:

"Q. When did you first see him (Bristol)? A. When he was standing at the booth, when he came over to the booth. Q. Which way was he facing? A. He was facing the booth. Q. Right directly facing the booth? A. Yes. Q. What did he do? He just stood and looked, that's all. Q. Did you notice him in any particular way on account of anything? A. Yes, because he sort of glared a little bit. He kind of looked as me as if—— Q. As though you had done something wrong? A. Yes. Q. Did you notice whether or not he said anything? A. He did not. Q. Did Wesley say anything? A. No. Q. And then what happened after that? A. After that Bristol walked into the hallway, there, or into the washroom, I suppose. Q. Into the hallway out of sight? A. Yes. Q. What did Wesley do? A. He got up and followed him. Q. Did he get up immediately? A. Well, very shortly afterwards."

Norman Johnson, who was sitting in the same booth with Skogerson, testified that he did not see the defendant stop at the booth, although his clear view might have been obstructed. The witnesses are not

altogether agreed as to the details of the matters which happened subsequently, which is not, perhaps, surprising. The witness Claudie Thomas testified that when the defendant reached the entrance of the hall, he looked around, asking whether he, Thomas, was coming; that Skogerson stated "there is that god-damned Bristol," pushed him, Thomas, aside, and as Bristol turned, hit him in the face, so that he fell over backwards. The witness Billie Thomas corroborated Claudie Thomas as to the statement made by the deceased, and he testified that when the deceased and defendant were in the hallway, the former had hold of the latter, raising him up and throwing him down again. Gilbert, the manager of the restaurant, attempted to interfere. He testified that he stepped across Bristol, who was then down on his hands, knees and elbows, endeavoring to protect his head by pulling his overcoat over his face; that he, Gilbert, seized Skogerson; that Skogerson knocked him back, and that he, Gilbert, retreated, returning to the cafe to telephone the police. As he reached the telephone, there was a shot.

The deceased was a few seconds later found in the washroom, which, by a swinging door, led from the hall, southward. It was about 10 feet long from north to south, and about three feet wide. The room contained two wash-bowls on the west side, leaving only about 20 inches between the bowls and the wall to the east. In the south end of the room was a toilet, occupying about two and one-half feet from north to south. The deceased was lying with his feet about at the entrance to the washroom, at the swinging door, with the door seemingly held open. He was shot in the throat, from which wound he died the following day. His head was some six feet south near the east wall. This indicates that he was going into the washroom, and the further indication is that he was shot when about at the swinging door, and that Bristol, who shot

him, was ahead of him and inside the washroom, the distance of which is uncertain. The first man to arrive on the scene, within a few seconds after the shot was fired, was the witness Overton, who testified that the defendant was then within a few feet of the toilet. Barkentine, a policeman, was the next person to arrive, within a few seconds after Overton arrived. He testified that the defendant was then standing near the swinging door, whether north or south of it is not clear. The state sought to show, by the witness Pippert, that Overton at the coroner's inquest had placed the defendant, when he first saw him, at the same place testified to by Barkentine, but the record is not clear whether Pippert's testimony should be regarded of any importance or not.

Bristol was disheveled, bruised and bloody. The witness Overton testified that Bristol had blood on his face; Barkentine, that Bristol "had blood over his face and his hair was kind of mussed up"; that he spoke to Bristol "and he tried to answer me, and that's all. He never spoke one word." Nor did Bristol answer remarks addressed to him by Overton. Barkentine said further: "I could see he had been in a fight. He was bloody and his hair was mussed up." Bristol testified concerning his own condition:

"Q. What was your condition after the encounter there with Skogerson in that room? What happened to you? A. Well, I don't exactly know what did happen to me, but I knew that I was hurt. I thought that I was pretty badly hurt. * * * My head was hurt badly. * * * It seems to me that I was hurt all over. I was weak, and it seemed to me like I had trouble moving my head and my arms and legs. * * * My eyes were all full of blood, and they were bloody, and I was blood all over my face and my eyes. * * * I had this bone, the bone in my nose was cracked, and I had a small cut and a bump behind my ear here (indicating) and there was a cut inside my mouth there where my teeth cut my mouth, and I had a bump right here on my

head, and there was another one about here (indicating), and I think there were two on my forehead. Q. Do you know what caused that cut on your head, Mr. Bristol? A. I couldn't say exactly what caused it, but I thought at the time that it happened that I was kicked in the head."

Dr. DeKay testified, concerning Bristol's injuries:

"His most severe injury was a rather long lacerated wound on the scalp, on the left side, which was about two inches long, extending down to the outside line of the skull. He had * * * a good black eye on the left side. He had a big bruise on his nose and one or two small ones on the forehead."

■ The court gave the ordinary instructions on self-defense, proceeding upon the theory that the right to such self-defense existed. No complaint is made of these instructions. But in addition thereto the court gave certain instructions which proceed upon the theory that the defendant might not have the right of self-defense, or that such right was limited. These instructions, namely numbers 16 and 17, were as follows:

"Instruction No. 16. You are instructed that if one is an aggressor or provokes a difficulty or affray, he cannot invoke the right of self-defense to justify the killing of his antagonist, unless he first, in good faith, withdraws or attempts to withdraw from the combat, and that, too, in a way that his adversary will see that he intends to withdraw, and he cannot justify the slaying of an adversary, because in the course of an encounter, when to save his own life or to save himself from great bodily harm it became necessary to kill, where he has been at fault in causing the difficulty in which he becomes endangered."

"Instruction No. 17. You are instructed, in relation to the law of self-defense, that one cannot claim the benefits of the law of self defense, after he has intentionally put himself where he knows or believes he will have to invoke its aid."

These instructions were evidently given by the trial

court upon the theory that there was sufficient evidence from which the jury could infer that the defendant was himself at fault and thus could be regarded as the aggressor, which would deprive him of his right of self-defense. Counsel for defendant insists that there was no sufficient evidence to submit that question to the jury. We are cited by the state to State v. McCann, 43 Or. 155, 72 Pac. 137, in which the court gave an instruction similar to instruction No. 17, supra. But that case is of no assistance here, since the accused in that case was clearly the aggressor—the very point which we are required to determine here. The inapplicability of that case here was pointed out in State v. Goodager, 56 Or. 198, 106 Pac. 638, 108 Pac. 185. A man who provokes a conflict—who is at fault in bringing it on—cannot shield himself by saying that he slew his opponent in self-defense. That rule was fully discussed in the case of Flory v. State, 40 Wyo. 184, 276 Pac. 458. However, the fault must be legally sufficient. The facts in the Flory case are dissimilar to those in this case. Let us examine the situation we have before us.

The state, in answering the argument of appellant, argues as follows:

"Counsel for defendant have said, and will immediately repeat, that there is no evidence in the instant case that Bristol was the aggressor. Such is not the fact. Bristol did not go home from the liquor store. He went out looking for Skogerson. He came to the restaurant armed and looked in to ascertain definitely if deceased Skogerson and Johnson were present. He went back before the booth where deceased sat as if to taunt him as a picador does a bull. He knew that his actions would provoke a quarrel and in the dimly lighted back hall he could shoot deceased with impunity."

The state accordingly thinks that three different facts show that defendant provoked the deceased to

combat and thus was the aggressor in the conflict immediately leading up to the time when the deceased was killed, namely, (1) that the defendant armed himself; (2) the fact that he went where Skogerson was, and (3) the fact that he "glared" at the witness Flo Hall. In analyzing these facts, we must not confuse the "provocation" of Skogerson by the defendant with the necessity of killing which arose after the deceased attacked the defendant.

It has been held that one may lawfully arm himself in reasonable anticipation of a dangerous attack. State v. Welch, 37 N. M. 549, 25 P. (2d) 211, 215; State v. Burkett, 30 N. M. 382, 234 Pac. 681 and authorities cited. To do so may, of course, have a tendency to show the state of mind of the defendant, although it has been held that the mere fact of arming does not justify the inference that this was done for the purpose of attacking the deceased. Thompson v. U. S., 155 U. S. 271, 39 L. Ed. 146, 15 Sup. Ct. 73; Wharton, Homicide, (3rd ed.) Sec. 279. However that may be, we are here dealing merely with the question of provoking the deceased to combat. That could not be done except by acts made known to him. It is psychologically impossible for a man to be provoked by something of which he is ignorant. The deceased in this case did not know that the defendant was armed. Hence whatever bearing such arming might otherwise have on the case, it could not have any tendency to show that the defendant thereby provoked the deceased in attacking him, and this fact must, accordingly, be eliminated in the consideration of the immediate question before us.

The second act above mentioned is of a somewhat different nature. When defendant went to the restaurant, he could be seen. He testified that he did not intend to go to the place where the deceased was, and if his testimony is true, no particular blame can be

laid at his door. But the jury evidently disregarded that testimony. The state thinks that he should have gone home, instead of going to the restaurant. The jury doubtless took that view, and it is not improbable that the fact that he did not go home was the most potent factor in convicting the defendant. And, ethically speaking, that, perhaps, is what he should have done. Without saying what the true facts are in this case, it *is* true that standing upon one's rights is not always the best course. The predicament in which the defendant finds himself today is good evidence thereof. Many times it pays and pays in solid rewards to follow the advice of Buddha when he urged: "Let a man overcome anger by love; let him overcome evil by good," or to follow the advice of Christ when he exhorted: "Resist not him that is evil, but whosoever smiteth thee upon thy right cheek, turn to him the other also." But we have not arrived at such happy age. The difficulties in the way of reaching such end seem to be more herculean than the labors of Hercules. The restaurant was a public place. It was in itself not an unlawful or wrongful act for the defendant to go there. If it was wrongful, it was made so because the deceased had made wrongful and unlawful threats. The mind recoils from drawing such illogical conclusion. Logic, of course, must give way at times to the larger interests of ethics and public policy, and if the latter clearly required the defendant to avoid the restaurant in this case because of the threats, we should disregard the logic of the situation. But the point here under consideration involves ethics and public policy as well. It involves the balancing of the interests between liberty and freedom of movement and the restraint thereof. It involves the question as to whether or not the law can afford to encourage bullies to stalk about the land and terrorize citizens by their mere threats. We hesitate to lay down a rule which

would do that. The principle involved here bears a similarity to the principle or rule prevailing in some jurisdictions relating to "retreat to the wall." In both is involved the rule of avoidance of homicide. The rule of retreat to the wall is applied (where it prevails) in cases of actual assault. In cases such as that before us, the element of time seems to be of greater importance, seemingly making a fairly distinguishing mark between the two classes of cases. If a man must curtail his freedom of movement by reason of threats made against him, during what length of time must he do so? Is it for just a few hours, a day, a week, a month? It might be as fatal in the one case as in the other. In any event, whether our analysis is correct or not, at least some of the courts, as those of Kentucky and Alabama, which hold to the rule of "retreat to the wall" (note 18 A. L. R. 1280) also lay down the rule that a man has a right to go where he will notwithstanding threats against him. Counsel for the state seem to think that this court in its previous opinions has disposed of the question here involved, relying particularly on the fact that at various times we stated or stressed the fact that the right to kill is based on the law of necessity or apparent necessity. But none of the cases, except State v. Flory, supra, dealt with a situation similar to the one which we have before us. Courts have not yet been able to state the complete law on the subject of self-defense in a sentence which would have no exception. Note, for instance, the statement of Clark on Criminal Law hereafter cited. The duty to avoid a difficulty; that one who kills must not be at fault; that the right to kill is based on the law of necessity or apparent necessity, are broad and general terms, and if literally applied would cover the point now before us. But such expressions must be construed in the light of the facts. The law takes human nature into consideration and attempts to meet

that which takes place in the ordinary course of human action. All would agree that a man should not be compelled to shun his own home in order to avoid the threatened, unlawful action of another. Few, if any, would dissent that the rule should be the same as to going to the place of a man's business. The differences of opinion would arise in connection with going to other places in the face of such threats. Probably all would agree that if it is necessary to go to a place, a man should be permitted to do so. But there are degrees of necessity. A defendant would be apt to be disbelieved by a jury, as they probably disbelieved the defendant in this case, so that, if the question of necessity of going were made the criterion, a defendant would determine that question at his peril, and his liberty of movement would be materially curtailed. There is, perhaps, more room for debate in a case where the defendant merely at or for his pleasure goes to where his antagonist is. But courts have generally (with the possible exception of South Carolina— see State v. Jones, 113 S. C. 134, 101 S. E. 647), doubtless on the grounds of public policy heretofore mentioned, laid down the rule that a man may go where he has a right to be, and we hesitate in view of the apparently overwhelming authority to that effect, to hold that such rule should not prevail in this state. Let us see what some of the authorities have stated.

Clark on Criminal Law, p. 11, states that "one who seeks a person who intends to kill him, or otherwise brings the danger upon himself, cannot avail himself of the plea of self-defense; but it is not to be inferred from this that he is bound to keep in hiding, or otherwise give up his freedom. In order to keep out of the other's way." "Flight is a mode" states the court in Long v. State, 52 Miss. 23, 35, "of escaping danger to which a party is not bound to resort, so long as he is in a place where he has a right to be, and is neither

engaged in an unlawful enterprise, nor the provoker of, nor the aggressor, in the combat." In Carnes v. Com., 27 Ky. L. 1205, 87 S. W. 1123, it appears that the deceased had threatened the defendants, and the latter thought that probably they would meet the deceased in a store to which they went. They had armed themselves. The appellate court censured repeated questions of the prosecuting attorney of one of the defendants why he had not gone home instead of going to the store. And among other things the court said:

"There was no evidence that the accused sought or provoked the difficulty, unless their going to the store armed with pistols was evidence of that fact. * * * They both stated that they carried their pistols to protect themselves from the deceased and the father of Hubart Mills who also threatened to kill them; that they did not know that they, or either of them would be at the store, but thought it probable they would be. It might be best for peace and the good of society to remain at home and abstain from transacting business, and give the dangerous, lawless element possession of the highways and places of business. The law does not require this, but gives equal rights to all at such places."

The Supreme Court of Missouri, in State v. Barrett, (Mo.) 59 L. R. A. 756, discussed the right of freedom of movement by one who had been threatened, and stated among other things:

"The right to go where one will, without let or hindrance, despite of threats made, necessarily implies the right to stay where one will, without let or hindrance. These remarks are controlled by the thought of a lawful right to be in the particular locality to which he goes or in which he stays. It is true, human life is sacred, but so is human liberty. One is as dear in the eye of the law as the other, and neither is to give way and surrender its legal status in order that the other may exclusively exist, supposing for a moment such anomaly to be possible. In other words, the wrongful and violent act of one man shall not abolish

or even temporarily suspend the lawful and constitutional right of his neighbor."

In 13 R. C. L. 833, the rule is stated thus:

"The mere fact that one does an inconsiderate, yet not unlawful act, will not forfeit the right of self-defense; and the right exists, notwithstanding a mere preparation to commit the wrongful act, where there is no accompanying demonstration which indicates the wrongful purpose. The accused must willingly and knowingly have used some language or have done some act after meeting his antagonist, reasonably calculated to lead to an affray or deadly conflict, and unless such act was clearly calculated and intended to have such effect, the right of self-defense is not lost, even though the defendant armed himself and went there for the purpose of conflict."

In 13 C. J. 50, Section 219, the rule is stated thus:

"The exercise of a legal right in a lawful manner is not such an act of provocation as will deprive the person exercising it of his right of self-defense, although, having reason to believe that it will result in a struggle or conflict, he arms or otherwise prepares himself accordingly; or, although by exercising such right, he puts himself in the way of being attacked."

In the case of Patterson v. State, 75 Miss. 670,, 675, it appears that the defendant took a gun, went to where the deceased was, halted him, asked him what he meant by coming through defendant's premises, and later, in a struggle shot the deceased. It was held that the right of self-defense was not taken from him. In the case of State v. Evans, 124 Mo. 397, 410, the court, in disapproving an instruction which was given, said in part:

"The fact that defendant *expected* an attack did not abate by one jot or tittle his right to arm himself in his own proper defense, nor to go where he would, after thus arming himself, so long as he did no overt act or made no hostile demonstrations toward Fine (the deceased). The defendant was where he had a right to be."

In the case of State v. Mathewson, 148 Mo. 185, 49 S. W. 1085, 71 A. S. R. 594, the court said:

"Nor is it true that a party who expects to be attacked has no right 'to put himself in the way of being assaulted' etc. So long as defendant did no overt act toward Morgan (the deceased) he had a perfect right to go where he would, and the expectation of being assaulted cuts no figure in the case."

In the case of Gibbons v. Terr., 5 Okl. Crim. 212, 115 Pac. 129, the court, in disapproving of an instruction given by the trial court, stated as follows:

"The instruction given (No. 18) deprived the appellant of the right of self-defense. Under it, intent alone destroys the right of self-defense. Even though defendant committed no overt act and was guilty of no provoking conduct leading up to the killing, yet, if he went to the premises of the deceased with an intent, the existence of this intent, though not revealed by word or act, deprives him of the right to defend his life. This is not the law. The court of Criminal Appeals of Texas, in the case of Tardy v. State, 46 Tex. Cr. R. 214, 78 S. W. 1077, in discussing a similar proposition, says: 'This charge is erroneous, and, under all the authorities, it is laid down that bare intent and purpose to provoke a difficulty does not deprive defendant of the perfect right of self-defense. He must do some act or something at the time of the difficulty that does provoke the same.' The instruction is erroneous for the further reason that it does not define or explain the legal meaning of the expression 'sought or brought on the difficulty.' These are legal terms and should have been defined by the court. Wharton says: 'Where rules of law with reference to bringing on a difficulty are charged, the court should define and state what character of acts on the part of the accused would deprive him of the right of self-defense. And, where a prosecution for homicide is carried on on the theory that the defendant provoked the difficulty in which the killing was done, the character of the provocation, in connection with the intent, should be set out and defined in separate and affirmative charges in behalf of

the state.' * * * Seeking a difficulty is a broad general term, and in its popular sense he might be said to have sought the difficulty if he went there expecting attack to be made on him; but of course this was not the bringing on of the difficulty in a legal sense. One is not justified in killing another because the other harbors a murderous intent and the right to defend one's self is not forfeited because there is in the mind intent and design. Intent unrevealed is like thoughts unexpressed, and the existence of an intent should never warrant the taking of human life or prevent the protection of it."

In the case of Thompson v. U. S., 155 U. S. 271, 15 Sup. Ct. 73, 39 L. Ed. 146, the trial court instructed the jury that if the accused thought that deadly danger would come upon him, but he is away from it, so he can avoid it, his duty is to stay away from it and avoid it. The Supreme Court in disapproving of the instruction stated:

"These instructions could, and naturally would, be understood by the jury as directing them that the accused lost the right of self-defense by returning home by the road that passed by the place where the deceased was, and that they should find that the fact that he had armed himself and returned by that road was evidence from which they should infer that he had gone off and armed himself and returned for the purpose of provoking a difficulty. Certainly the mere fact that the accused used the same road in returning that he had used in going from home would not warrant the inference that his return was with the purpose of provoking an affray, particularly as there was evidence that this road was the proper and convenient one. Nor did the fact that the defendant, in view of the threats that had been made against him, armed himself, justify the jury in inferring that this was with the purpose of attacking the deceased, and not of defending himself, especially in view of the testimony that the purpose of the defendant in arming himself was for self-defense."

In Airhart v. State, 40 Tex. Cr. 470, 51 S. W. 214, 76 A. S. R. 736, the court stated that "no matter what

his (defendant's) purpose was in seeking deceased, if, when he met him, he did nothing to provoke a difficulty, and deceased assaulted him, under our view of the law, his right of self-defense would be perfect." And the same court stated its view even more clearly in Thomas v. State (Tex. Crim. App.) 51 S. W. 1109, where it is said:

"It is not a violation of law to seek a party for the purpose of provoking the difficulty. The offense is provoking the difficulty. We have held that a party can arm himself, and go where a person is, but, after reaching there, if he did not provoke the difficulty, or do some act or make some statement reasonably calculated to provoke the difficulty, he could not be convicted of provoking the difficulty."

In Blackwell v. State, 103 Tex. Crim. 423, 281 S. W. 213, the court stated:

"An accused may seek a party with intent to provoke a difficulty, but he does not forfeit his right of self-defense, unless, after he has found his adversary, by words or acts or both, he then in fact provokes the difficulty. In fact it has been held that he must go further than even this before his right of self-defense can be so limited. He must not only have intended to provoke his adversary in order to gain the vantage ground of acting apparently on the defensive, but he must do something or say something, either or both, with the intention and purpose of causing his adversary to make the attack, and then the things he does or says must be reasonably calculated to effect the object."

See further 30 C. J., p. 50, note 45 and 56; p. 51, note 73; p. 52; note 45 L. R. A. 690; note, 2 L. R. A. N. S. 59; Karr v. State, 106 Ala. 1, 11; Sanford v. State, 53 Fla. 1, 13; Cotton v. State, 91 Tex. Crim. 534, 240 S. W. 918; State v. Hudspeth, 159 Mo. 178, 60 S. W. 136; Wharton, Homicide (3rd Ed.) Sections 279, 324; Allen v. Comm., 86 Ky. 642. These citations should suffice to show that neither the fact of arming himself, nor the fact of going to the restaurant, even

if he knew that the deceased was there, was sufficient to deprive the defendant of the right of self-defense. The criterion is as to what he then did or said when he found the deceased, and whether what he said or did was reasonably calculated to cause the deceased to be provoked into attacking the defendant. We pointed out in State v. Flory, 40 Wyo. 184, 201, 276 Pac. 458, the rule that not every act of a defendant can be construed as an act of provocation. We applied that rule in State v. Radon, 45 Wyo. 383, 19 P. (2d) 177. One of the best cases discussing the rule is Foutch v. State, 95 Tenn. 711, 45 L. R. A. 687, where the court said:

"It is true that such statements are to be found in many books,—that if one be the 'aggressor' or be 'in fault' or 'provoke a difficulty,' he cannot rely upon the plea of self-defense. But such general statements are only true when taken in the limited sense in which they must be understood, and with the qualifications with which judicial utterances that gave them existence have guarded their application. In order to make a man guilty of murder, who is the 'aggressor' or 'in fault' or who 'provokes a difficulty' in which his adversary is killed, he must have provoked it with the intent to kill his adversary or do him great bodily harm, or to afford him a pretext for wreaking his malice upon his adversary. * * * In order to deny to such party the right to rely upon the plea of self-defense, it must appear that he was the 'aggressor' or 'in fault' or 'provoked the difficulty' in such way and with such intent as the law contemplates in the use of these terms. It is not every 'aggression' which produces a difficulty that is an unlawful one, within the meaning of this phrase, nor is it every 'fault' which a man might commit that precludes him from defending himself when violently assaulted or menaced, nor is it every 'provocation of a difficulty' which robs him of the right of self-defense. * * * It is not every provocation, just or unjust, which he may offer, that will justify an assault upon him, or the menace of one, from which he cannot defend himself, and to this, also, the limitations as to mere words used apply. After all, the aggression, the

fault, or the provocation depends upon its character and its intent. If it is an assault, or the menace of one, by an overt act, or the provocation of a difficulty with intent to inflict death or great bodily harm in the event it is resisted, made of malice to bring about that result and enable the provoking party to wreak his vengeance on the assailant, that is an 'aggression' or 'fault' and a 'provoking of a difficulty,' within the legal sense and meaning of the terms. If the 'combat is provoked,' or 'the occasion to kill is produced,' in the language of the charge, on this account, with this intent, and for this purpose, defendant cannot rely upon the plea of self-defense; otherwise he can."

The Kentucky court stated the rule in McCarty v. Com. (Ky.) 51 S. W. (2d) 249, as follows:

"A challenge to mortal combat, an assault, or a personal affront of such serious character as to be reasonably calculated to provoke and to precipitate a dangerous assault from another, are generally deemed sufficient to authorize a jury to deny the ordinary right of self-defense. But the offensive and provoking words must be spoken at such time and under such circumstances as to lead a reasonable mind to the conclusion that they constituted a bringing on of the difficulty with intent to kill or injure seriously the other party. Trivial words or slight provocation, not reasonably calculated and probably not designed to bring about an immediate fatal encounter, have never been deemed sufficient to deprive a defendant of his right of self-defense."

Whether or not a particular act is sufficient to constitute provocation is sometimes a question for the jury. Crawley v. State, 117 Tex. Crim. Rep. 372, 34 S. W. (2d) 437. Often it is a question for the court. As illustrating as to what does not constitute provocation, the following facts have been held insufficient: Mere trespass (Bennett v. State, 19 Ga. App. 442, 91 S. E. 889) ; shooting at a tire, under the circumstances: State v. Borwick, 193 Iowa 639, 187 N. W. 460; calling the deceased a "son of a bitch"—under the circum-

stances; Shrout v. Com., 170 Ky. 796, 186 S. W. 885; engaging in a dispute as to a boundary line: Jones v. Com., 186 Ky. 286, 216 S. W. 607; see also Richards v. State, 86 Tex. Crim. 414, 216 S. W. 888; Cottom v. State, 91 Tex. Crim. 534, 240 S. W. 918; Allen v. Com., 86 Ky. 642. The only overt act, if any, of which the defendant was guilty in the case at bar, was a momentary stopping at the booth where the decedent was sitting, and because, according to the testimony of the witness Flo Hall, he looked at her and "sort of glared a little bit." She did not describe the "glare" any further. It consisted, doubtless, of some appearance or movement of the eye. So far as can be told from the language used by the witness, the "glare" may have represented a momentary shock or fright on seeing the deceased. In any event we cannot conceive how anyone could reasonably consider it as an act of provocation. We think that to so hold would be shocking to the conscience. There was, accordingly, no evidence in the case which in any way limited defendant's right of self-defense. The deceased was clearly the aggressor throughout, emphasized by his towering strength as compared with that of defendant. The giving of instructions 16 and 17 must be held to be prejudicial error. Wharton, Homicide, p. 506; Richards v. State, supra; Cottom v. State, supra.

■ The court instructed the jury in Instruction No. 15 as follows:

"You are instructed that to justify a homicide on the ground of self-defense, it must appear that the defendant was in great peril of death or serious bodily harm, or had reasonable grounds for believing and did believe, that he was in such peril, and that the killing was necessary to avert such peril, *and that no other visible means of avoiding it was open to him.*"

Instruction No. 18 was similar. The objection of the defendant is urged against the italicized portion. The

state argues the point on the theory that it was the duty of the defendant to "retreat to the wall" before killing the deceased. And it is probable that the clause in question refers and was intended to refer to that rule. The clause would not be held objectionable in Delaware, where the rule of "retreating to the wall" obtains. State v. Stevenson, (Del.) 188 Atl. 750. We do not think that we are called upon to decide whether that rule should be adopted in this state or not. The defendant retreated into a small and narrow washroom, with swinging doors, and was followed by the deceased. The room contained no back or side outlet, and it would seem that under the circumstances he should not be held to a greater duty in this connection, or the point is at least one of very grave doubt.

■ The defendant contends that the evidence is not sufficient to convict him. It is not necessary to pass upon that point, since we probably would not in any event be justified to do anything else than to order a new trial. The point depends upon the necessity or apparent necessity existing at the time of the struggle in the hall and washroom of killing the deceased in order to prevent great bodily harm. Some uncertainty has been left in the record before us by reason of the fact that some witnesses indicated places on the map, without leaving any clew for this court—a method condemned by this court in State v. Aragon, 41 Wyo. 308, 320, 285 Pac. 803. If we ignore the testimony of the defendant, as the jury perhaps did, then the last things shown by the record just previous to the homicide are the fact that the deceased was still in a fighting mood when Gilbert tried to stop him, but knocked him against a wall, and that the deceased then had the defendant down on the floor, and the further fact that the deceased evidently followed the defendant into the washroom. So the solution of the question of the sufficiency of the evidence to convict may, perhaps, depend

**332**

upon the burden of proof as to self-defense. The authorities on that point are divided. It has not been argued by the parties in this case, although the state in one of its briefs seems to take it for granted that the burden in this respect is on the defendant. Trumble v. Territory, 3 Wyo. 280, and perhaps State v. Pressler, 16 Wyo. 214, should be read in that connection. On the whole, though the case is one of doubt, we have deemed it best not to pass upon the point here considered.

For the errors herein pointed out, the judgment of the trial court is reversed, and the cause is remanded for a new trial.

*Reversed and remanded.*

RINER and KIMBALL, JJ., concur.