Fox, Justice.
[¶1] A jury convicted Misty Lynn Widdison of aggravated assault and attempted second-degree murder after she stabbed her uncle. Ms. Widdison argues that the jury instructions contained numerous errors and that evidence of specific instances of conduct relevant to her uncle's violent character was erroneously excluded. Because the trial court improperly resolved the disputed factual question of whether Ms. Widdison resided in her uncle's home and accordingly declined to give the defense's proposed instruction regarding the duty to retreat in one's residence, we reverse and remand.
ISSUES
[¶2] We reorder, rephrase and clarify the issues as follows:
I. Did the district court err when it:
A. Rejected the defense's proposed instruction regarding the duty to retreat in one's own residence based on the court's determination of fact?
B. Provided the jury with two separate standards for assessing the claim of self-defense without indicating which standard applied to which charge?
C. Gave an instruction on the right to arm oneself in anticipation of an attack which was limited to situations of extreme danger?
D. Gave instructions regarding the first aggressor and the duty to retreat that did not clearly allocate the burden of proof and that have been held to constitute plain error?
E. Gave an incorrect malice definition?
F. Failed to provide definitions of "recklessly" and "recklessly under circumstances manifesting an extreme indifference to the value of human life"?
II. Did the district court abuse its discretion when it prohibited testimony of specific instances of conduct relating to the victim's character for violence under W.R.E. 404(a)(2) and 405(b) ?
[¶3] The district court's resolution of the factual question whether Ms. Widdison resided in David Jones' home requires us to reverse and remand. Accordingly, we address the remaining issues only to the extent our resolution will be helpful to the district court on remand.
FACTS
[¶4] Ms. Widdison resided with her uncle, Mr. Jones, off and on, usually six or more months at a time, for five years. Beginning February 22, 2016, Ms. Widdison again began staying with Mr. Jones. On Sunday, February 28, Mr. Jones brought home a case of beer and a bottle of rum and shared it with Ms. Widdison. They drank and watched television for most of the afternoon and into the evening. At around 4:30 that afternoon, Mike Nygard, a friend of Mr. Jones, stopped by. He testified that both Ms. Widdison and Mr. Jones were very drunk and were arguing. He stayed for several hours, and at one point took Ms. Widdison to his home. He took her *1209 back at approximately 7:30 p.m., but did not go inside.
[¶5] About a half hour later, Mr. Nygard received the first in a series of voicemails from Ms. Widdison. Mr. Nygard did not listen to the voicemails until later that evening when Ms. Widdison's mother telephoned him. Ms. Widdison's mother and stepfather had received a voicemail from Ms. Widdison in which she said, "I've got a bleeder" and indicated she needed help. In response, they contacted Mr. Nygard and asked him to check on Widdison and Jones. Mr. Nygard listened to his voicemails. In the final voicemail, Ms. Widdison repeated the statement, "cleanup on aisle nine" several times. Mr. Nygard called 911.
[¶6] When the sheriff's officers arrived, Ms. Widdison came outside, said something they did not understand, and went back into the home. They entered and found Mr. Jones lying on the floor, covered with blood, and stating something about molesting little girls. Ms. Widdison made statements indicating that Mr. Jones had "tried touching" her. Bloody footprints matching Ms. Widdison's boots surrounded Mr. Jones, and the blood on the carpet had dried by the time the officers arrived. Two bloody knives were found in the kitchen sink. EMTs arrived shortly after the sheriff's officers and began to administer first aid. Mr. Jones was hospitalized and treated for a cut on his hand and three stab wounds, one in his thigh and two in his neck.
[¶7] Mr. Jones did not have a clear recollection of the events leading up to the incident. He did testify that when their argument began to escalate, he told Ms. Widdison that she had to leave his home. Ms. Widdison testified that the conflict arose because Mr. Jones insisted that she give him oral sex in exchange for staying at his home. She stated that he threatened her with a knife and pinned her to the ground, and that she wrestled the knife away from him. She recalled nothing about the stabbing or a second knife. Ms. Widdison also testified that she was afraid Mr. Jones was going to kill her and that he had threatened her with weapons before. The defense presented two additional witnesses. Darcey Fulmer, another of Mr. Jones' nieces, testified that Mr. Jones had a propensity for violence and inappropriate sexual solicitation and touching, especially when he was drunk. The second witness, Mr. Jones' nephew, Yancey Norton, also testified regarding Mr. Jones' reputation for violence and for making unwanted sexual advances. Mr. Norton recounted an incident in which Mr. Jones had locked him and Ms. Widdison in the basement and threatened to kill them with a gun he was holding. The district court interrupted the testimony and prohibited the defense from presenting that or other testimony regarding specific instances of Mr. Jones' conduct. The defense rested without calling two additional family members who had been listed as witnesses to testify regarding Mr. Jones' reputation and propensity for violence.
[¶8] The district court instructed the jury regarding both aggravated assault and attempted second-degree murder. The instructions included instructions on self-defense, the right to arm, and the definition of "maliciously" as applied to attempted second-degree murder. The court refused Ms. Widdison's proposed instruction on the "castle doctrine."[1] These instructions are discussed in detail below. The jury returned guilty verdicts on both counts, and the district court sentenced Ms. Widdison to concurrent sentences of twenty-five years on the attempted second-degree murder charge and eight to ten years on the aggravated assault charge. This appeal follows.
DISCUSSION
I. Did the jury instructions result in prejudicial error?
A. Did the district court err when it rejected the defense's proposed instruction regarding the duty to retreat in one's own residence based on the court's determination of fact?
[¶9] Ms. Widdison argues that the district court erred when it refused to give her proposed *1210 castle doctrine instruction. The question of whether a cohabitant may assert the castle doctrine against another cohabitant is a question of first impression in Wyoming. Accordingly, we first consider this issue. Because we conclude that the castle doctrine applies between cohabitants, we will also consider whether the district court's refusal to give the castle doctrine instruction was erroneous.
1. Cohabitants and the use of the castle doctrine
[¶10] The majority of jurisdictions that have considered the issue conclude that a cohabitant does not have a duty to retreat in his own home when, through no fault of his own, he is assailed by another cohabitant.[2] Linda A. Sharp, Homicide: duty to retreat where assailant and assailed share the same living quarters , 67 A.L.R.5th 637, § 2(a) (1999 & 2017 Supp.) (fourteen jurisdictions hold cohabitant has no duty to retreat; seven jurisdictions require cohabitant to retreat, one of which (Florida) has since abandoned that rule); see also State v. Shaw , 185 Conn. 372, 441 A.2d 561, 565 (1981) (noting that most jurisdictions have adopted the rule that there is no duty of retreat with cohabitants and unlawful intruders). These courts reason that it would be illogical to require retreat when one is attacked in one's own home by a cohabitant, but not when attacked by a stranger. "The danger posed and the sanctuary of the dwelling is the same regardless of the status of the attacker." State v. White , 20 Neb.App. 116, 819 N.W.2d 473, 479 (2012) (citation omitted). In State v. Glowacki , 630 N.W.2d 392, 401-02 (Minn. 2001), the Minnesota Supreme Court adopted the majority rule, explaining:
We require reasonable retreat in self-defense outside the home because the law presumes that there is somewhere safer to go-home. See [ State v. Carothers , 594 N.W.2d 897, 900 (Minn. 1999) ]. But self-defense in the home is based on the premise that the home is "a place critical for the protection of the family." Id. at 901. Requiring retreat from the home before acting in self-defense would require one to leave one's safest place. As Justice Cardozo explained in People v. Tomlins , 213 N.Y. 240, 107 N.E. 496 (1914), "[i]t is not now and never has been the law that a man assailed in his own dwelling is bound to retreat. If assailed there, he may stand his ground and resist the attack. He is under no duty to take to the fields and the highways, a fugitive from his own home. * * * Flight is for sanctuary and shelter, and shelter, if not sanctuary, is in the home." 107 N.E. at 497. The court in Tomlins went on to explain that the no retreat from the home rule was the same regardless of whether the aggressor was an intruder or a coresident. Id .
[¶11] In contrast, a minority of jurisdictions distinguish encounters between cohabitants and intruders and require retreat when one is attacked by a cohabitant. Those courts focus on the "entitlement of both combatants to occupy the house and the fact that they usually are related, and reason that the parties have some obligation to attempt to defuse the situation." Cooper v. United States , 512 A.2d 1002, 1005-06 (D.C. Ct. App. 1986) (citations omitted).
[¶12] We conclude that the majority rule is the better-reasoned approach. When a person is attacked within her dwelling, the right to defend herself and the privilege of non-retreat should not depend upon the identity of the attacker. "Further, forcing a resident to retreat from the home is at odds with the historical notion of the home as a place critical for the protection of the family." State v. Carothers , 594 N.W.2d 897, 901 (Minn. 1999). In addition, applying the castle doctrine to cohabitants will better protect victims of domestic violence. As the Florida Supreme Court recognized when it abandoned the minority view, "placing a duty to retreat from the home on the defendant may serve to legitimize the common myth [that victims of domestic violence are free to leave the battering relationship any time they wish to do so, and that abuse could not have been so *1211 bad because otherwise she would have left] and allow prosecutors to capitalize upon it." Weiand v. State , 732 So.2d 1044, 1052-54 (Fla. 1999), superseded by statute on other grounds , Little v. State , 111 So.3d 214 (Fla. Dist. Ct. App. 2013).
[¶13] Finally, our holding is compatible with longstanding self-defense principles. Beginning with Palmer v. State , 9 Wyo. 40, 59 P. 793, 795 (Wyo. 1900), we have consistently held that when a person without fault is attacked in his home, he may defend himself. In Palmer , we first adopted the castle doctrine. We explained that "the law does not require that [a person in his own home] shall avoid the necessity by retreating before his assailant. His house is his castle, and when it is invaded he is deemed to be 'at the wall,' and no further retreat is required." Id . (citations omitted). We established that a person in his own home has a right to defend himself against any person who attacks him:
Every man has a right to pursue his peaceful avocations in his own house and about his own premises, unmolested by threats or violence, or unlawful interference by any other person or persons ; and if, while pursuing these avocations, he is violently attacked in a manner indicating a purpose to perpetrate a known felony upon him, such as murder, mayhem, or the like, under such circumstances he is not obliged to retreat, but may pursue his adversary until he has freed himself from all danger.
Id . at 796 (emphasis added) (citation omitted). In State v. Flory , 40 Wyo. 184, 276 P. 458, 462 (Wyo. 1929), we again recognized that "a man need not retreat if assaulted, without fault, in his own home...." More recently in Haire v. State , we reaffirmed the rule, but declined to extend the castle doctrine beyond the home and its curtilage. 2017 WY 48, ¶¶ 29-30, 393 P.3d 1304, 1311-12 (Wyo. 2017) ("[A]n individual who is in his own home can stand his ground and need not retreat before killing his assailant if he is attacked with sufficient force.").
[¶14] When a person without fault is confronted in her place of residence, either by an intruder or by a cohabitant, she need not retreat. However, if that person is the initial aggressor, she is not without fault, and therefore has a duty to retreat prior to defending herself. The rule that "[t]he right of self-defense is not available to an aggressor who provokes the conflict, unless the aggressor withdraws in good faith and informs the other person by words or actions of a desire to end the conflict," Haire , 2017 WY 48, ¶ 36, 393 P.3d at 1314, applies whether the person is in her residence or not. See also Drennen v. State , 2013 WY 118, ¶ 39, 311 P.3d 116, 129 (Wyo. 2013) ; Cassels v. People , 92 P.3d 951, 956 (Colo. 2004).
2. Availability of the castle doctrine in Ms. Widdison's defense
[¶15] Having determined that the castle doctrine can be available when one cohabitant attacks another, we now examine Ms. Widdison's assertion that the district court erred when it refused to give her proposed castle doctrine instruction without first putting the fact question of whether Mr. Jones' home was her residence to the jury. We review the district court's refusal to give an offered instruction for abuse of discretion. Pina v. Christensen , 2009 WY 64, ¶ 8, 206 P.3d 1298, 1300 (Wyo. 2009). We have explained that an abuse of discretion occurs "when the trial court acts outside the bounds of reason or commits an error of law." In re L.L. , 2007 WY 92, ¶ 8, 159 P.3d 499, 501 (Wyo. 2007) (citations omitted). While the refusal to give an offered instruction is reviewed for an abuse of discretion, the question of whether the court invaded the province of the jury by making a factual determination constitutes an error of law is a legal question which we review de novo. See Weinstein v. Beach , 2014 WY 167, ¶¶ 8-9, 340 P.3d 1013, 1016 (Wyo. 2014) ; K.C. v. State , 2011 WY 108, ¶ 7, 257 P.3d 23, 25-26 (Wyo. 2011).
[¶16] Ms. Widdison testified that she considered Mr. Jones' home to be her residence, and that she used his address on her driver's license. Based upon this testimony, Ms. Widdison offered the following instruction:
If the defendant at her place of residence had reasonable ground to believe and actually did believe that she was in imminent danger of death or serious bodily harm and that the use of deadly force was *1212 necessary to repel such danger, she was not required to retreat or to consider whether she could safely retreat. The defendant was entitled to stand her ground and use such force as was reasonably necessary under the circumstances to save her life or protect herself from serious bodily harm.
At the instruction conference, the State argued that Ms. Widdison was a guest in Mr. Jones' home and could not claim that it was her residence. Defense counsel claimed that because she had come and gone from Mr. Jones' home for "a long period of time," it was her residence.
[¶17] The district court agreed with the State, concluding that the home was not Ms. Widdison's residence, and rejected the instruction:
The Court specifically relies upon the testimony that was presented that she was asked to leave. You don't ask somebody to leave their own residence if it's their residence, if it's their house. I don't think that's really refuted that that's what the underlying issue was.
I also find that anybody can put almost anything they want on their driver's license. I don't think that gives the additional accoutrements that you receive of the protections of having your castle.
[¶18] Our examination of the record persuades us that there are facts from which the jury could have inferred that Ms. Widdison resided in Mr. Jones' home and therefore may have been entitled to the castle doctrine instruction. Ms. Widdison testified that she considered Mr. Jones' home to be her residence; she had been living there off and on for a period of years; and she used that address on her drivers' license. The State questioned her regarding her residence on cross-examination:
[PROSECUTION]: So in relation to your residence, Mr. Jones' residence is the one that you've been allowed to live at most often, correct?
[MS. WIDDISON]: I've pretty much lived there for the last five years.
[PROSECUTION]: But you haven't lived there constantly?
[MS. WIDDISON]: There-there was a time while I was staying with a friend out of state.
[PROSECUTION]: And, in fact, at times you had tried to live with your parents in Morgan?
[MS. WIDDISON]: No. I hadn't lived with them since 2011.
[PROSECUTION]: Okay. Well, that's within that five year time frame, isn't it?
And you also lived with Mr. Norton?
[MS. WIDDISON]: That was briefly until I was in a car accident and then I went to stay with [Mr. Jones].
[PROSECUTION]: And every time that you would leave because of arguing, you always came back to Mr. Jones' residence?
[MS. WIDDISON]: It was usually [Mr. Jones] getting drunk and kicking us out because I have another-I have a cousin that also lived there as well. And it was just [Mr. Jones] being drunk and kicking people out of his house.
[PROSECUTION]: It's his house, isn't it?
[MS. WIDDISON]: Yes, but I also reside there.
[PROSECUTION]: And do you-do you pay on any mortgage or any rent on the house?
[MS. WIDDISON]: No, but I was helping him take care of his estate, taking care of the horses and the yard and things like that.
[¶19] Mr. Jones testified that since 2011, Ms. Widdison had lived with him off and on, for months at a time, sometimes up to "like, six, seven months," but that she did not pay rent. He testified that when she arrived at his home this time, he initially told Ms. Widdison that she could not stay with him, that he then agreed to let her stay there because it was her birthday, and that he told her she "probably wasn't going to be staying very long." Immediately prior to the incident, Mr. Jones told Ms. Widdison she had to leave.
[¶20] The State argues that Ms. Widdison was legally a trespasser because Mr. Jones had asked her to leave prior to the stabbing and that based upon the evidence, the district *1213 court's conclusion that Mr. Jones' home was not Ms. Widdison's residence was a reasonable one. However, even the district court recognized that the determination needed to be made in the face of conflicting evidence. The court remarked, "The testimony seems to be conflicting on that category and so I made a judgment call in that respect." Unfortunately, it was not the district court's job to make that call.
[¶21] "[C]riminal defendants are entitled to a jury trial with the jury as the sole fact-finder." Snow v. State , 2009 WY 117, ¶ 28, 216 P.3d 505, 514 (Wyo. 2009) (citations omitted). Indeed,
[t]he sanctity of the jury's role as fact-finder has always been honored in this State. In Taylor v. State , 612 P.2d 851, 854-55 (Wyo. 1980), we recognized the significance of the right by quoting 3 W. Blackstone, Commentaries, 379 as follows:
"Upon these accounts the trial by jury ever has been, and I trust ever will be, looked upon as the glory of the English law ... [I]t is the most transcendent privilege which any subject can enjoy, or wish for, that he cannot be affected either in his property, his liberty, or his person, but by the unanimous consent of twelve of his neighbours and equals...."
In a case published just a month after Taylor, we reiterated our view of the significance of the jury trial:
The aim of the guarantee of the right to trial by jury is to preserve the substance of the right of trial by jury as distinguished from mere matters of form or procedure, particularly to retain the concept that issues of law are to be resolved by the court and issues of fact are to be determined by the jury under appropriate instructions by the court.... The essential elements of a trial by jury are that there be impartial jurors, who unanimously decide the facts in controversy under the direction of a judge.
Lapp v. City of Worland , 612 P.2d 868, 873 (Wyo. 1980) (internal citations omitted).
Snow , ¶¶ 29-30, 216 P.3d at 514. This Court has consistently emphasized the principle that the jury-not the trial court and not the attorneys-resolves factual issues. See , e.g. , Garay v. State , 2007 WY 130, ¶ 2, 165 P.3d 99, 100-01 (Wyo. 2007) (jury as fact-finder resolves conflicts in the evidence); Leyo v. State , 2005 WY 92, ¶ 11, 116 P.3d 1113, 1116-17 (Wyo. 2005) (Supreme Court must preserve the jury's role as fact-finder); Kenyon v. State , 2004 WY 100, ¶ 14, 96 P.3d 1016, 1022 (Wyo. 2004) ("We have consistently held that it is the jury's responsibility to resolve conflicts in the evidence."); Ogden v. State , 2001 WY 109, ¶ 21, 34 P.3d 271, 276 (Wyo. 2001) (the jury's function is to resolve factual issues); Walston v. State , 954 P.2d 987, 988 (Wyo. 1998) (the role of jury as fact-finder is to evaluate evidence).
[¶22] The district court's "judgment call" regarding whether Ms. Widdison resided in her uncle's home invaded the fact-finding province of the jury. See Mersereau v. State , 2012 WY 125, ¶ 33, 286 P.3d 97, 112 (Wyo. 2012). The district court committed a legal error when it removed from the jury's consideration the factual question of whether Ms. Widdison resided in Mr. Jones' home. This legal error, in turn, caused the court to reject the castle doctrine instruction offered by Ms. Widdison. Under these circumstances, the rejection of the instruction was an abuse of discretion. We must now determine whether that abuse of discretion was prejudicial to Ms. Widdison. See Hodge v. State , 2015 WY 103, ¶ 8, 355 P.3d 368, 371 (Wyo. 2015) (if we find a district court abused its discretion, we must determine whether the error was prejudicial) (citing Mersereau , 2012 WY 125, ¶ 17, 286 P.3d at 106 ). "Error is prejudicial if there is a reasonable probability that the verdict might have been more favorable to the defendant if the error had not been made." Id . (citations omitted).
[¶23] The determination whether Mr. Jones' home was Ms. Widdison's residence was a question that had to be answered before the jury could have been instructed on the castle doctrine. Had the question been submitted to the jury, the jury might have concluded, as the district court did, that Ms. Widdison did not reside in Mr. Jones' home. In that case, omission of the castle doctrine instruction would be correct. However, had *1214 the jury concluded that the home was Ms. Widdison's residence, Ms. Widdison would have been entitled to the castle doctrine instruction.[3]
[¶24] The State argues that even if Ms. Widdison resided in Mr. Jones' home, the castle doctrine did not apply because she was the initial aggressor. The identity of the initial aggressor, however, was a question of fact upon which the jury was instructed. See infra ¶¶35. If the jury concluded that Ms. Widdison was the initial aggressor, even under the castle doctrine, she would have been required to retreat before defending herself. Drennen , 2013 WY 118, ¶¶ 24, 39, 311 P.3d at 125, 129 ; see also Flory , 276 P. at 462. Ms. Widdison's testimony that Mr. Jones had threatened her with a knife and pinned her to the ground before she wrestled the knife away, if believed by the jury, would have given the jury a basis upon which to conclude that Mr. Jones (and not Ms. Widdison) was the first aggressor. If the jury concluded that Mr. Jones was the first aggressor and that the home was Ms. Widdison's residence, it would have been properly instructed that, under the castle doctrine, Ms. Widdison was "entitled to stand her ground and use such force as was reasonably necessary...." However, based on the instructions given, if the jury determined that Mr. Jones was the initial aggressor, it was instructed that Ms. Widdison had to consider reasonable alternatives, which may include retreat, before resorting to deadly force. This would have been an incorrect statement of the law, if the jury believed Ms. Widdison was in her residence.
[¶25] We do not know what the jury concluded with respect to the initial aggressor when it determined that Ms. Widdison's defense of self-defense was not applicable in this case and convicted her on both counts, and we therefore find the error was prejudicial. There was a reasonable probability that, but for the jury's lost opportunity to determine the factual question of whether Ms. Widdison resided in Mr. Jones' home, the jury would have found that Ms. Widdison acted in self-defense and the outcome of the case would have been different. Ms. Widdison's convictions are reversed and remanded.
[¶26] The remaining instructional errors alleged by Ms. Widdison would normally be subject to varying standards of review. However, because we are reversing and remanding for a new trial, we will "simply analyze" these instructions to provide guidance on remand. Drennen , 2013 WY 118, ¶ 21, 311 P.3d at 124.
B. Did the district court err when it provided the jury with two separate standards for assessing the claim of self-defense without indicating which standard applied to which charge?
[¶27] Ms. Widdison asserts that the self-defense instructions concerning the nature of the perceived threat justifying self-defense (Instruction Nos. 18 and 21) were erroneous because they did not distinguish between the different standards for attempted murder and for aggravated assault. Instruction No. 18 provided:
If the defendant had reasonable grounds to believe and actually did believe that she was in imminent danger of death or serious bodily harm from which the defendant could save herself only by using deadly force against an assailant , the defendant had the right to use deadly force in order to defend herself. "Deadly force" means force which is likely to cause death or serious bodily harm.
The circumstances under which the defendant acted must have been such as to produce in the mind of a reasonably prudent person, similarly situated, the reasonable belief that the assailant was about to kill the defendant or do serious bodily harm to the defendant. The danger must have been apparent, present or imminent *1215 or must have appeared to be so under the circumstances.
If the defendant believed that she was in imminent danger of death or serious bodily harm, and that deadly force was necessary to repel such danger, and if a reasonable person in a similar situation seeing and knowing the same facts would be justified in believing that she was in similar danger, the defendant would be justified in using deadly force in self-defense. The defendant would be justified even though the appearance of danger later proved to be false and there was actually neither purpose on the part of the assailant to kill the defendant or do the defendant serious bodily harm nor imminent danger that it would be done, nor actual necessity that deadly force be used in self-defense. If the person so confronted acts in self-defense upon such appearance of danger from honest belief, the right of self-defense is the same whether the danger is real or merely apparent.
(Emphasis added.) Instruction No. 21 stated:
It is lawful for a person who is being assaulted to defend herself from attack if she has reasonable grounds for believing and does believe that bodily injury is about to be inflicted upon her. In doing so she may use all force which would appear to a reasonable person, in the same or similar circumstances, to be necessary to prevent the injury which appears to be imminent.
[¶28] Ms. Widdison recognizes that Instruction No. 18 provides the appropriate standard regarding the use of self-defense as it relates to a homicide charge and that Instruction No. 21 sets forth the appropriate standard governing self-defense for aggravated assault. Despite having proposed these instructions, she now argues that the district court erred when it did not differentiate between the two standards and explain their application. In support of her argument, she relies upon Drennen , 2013 WY 118, ¶ 43, 311 P.3d at 130-31.
[¶29] In Drennen , the defendant, who was charged with aggravated assault and battery and homicide, asserted a defense of self-defense to the charges. The jury received an instruction indicating that it was sufficient for a claim of self-defense to homicide that he reasonably perceived danger, even if such danger was not real. No corresponding instruction was provided regarding self-defense for the aggravated assault charge. We did not determine whether this omission was error, rather, "[b]ecause we [reversed and remanded] for a new trial on both convictions [due to prosecutorial misconduct], we ... simply analyze[d] the jury instructions without concluding whether any individual instruction constituted clear error or was prejudicial or harmless." Id. at ¶ 21, 311 P.3d at 124. We stated that "we believe it is a better practice to provide instruction on the concepts that apply to self-defense for the different crimes" and we "assume[d] that [would] be remedied at the retrial." Id . at ¶ 43, 311 P.3d at 131.
[¶30] Here, we do not believe the instructions were erroneous for two reasons. First, the instructions are accurate statements of the law. See Drennen , 2013 WY 118, ¶¶ 36, 40-42, 311 P.3d at 128-30. Second, even absent additional clarifying language, the language contained in the instructions referred to the charges to which they applied. Instruction No. 18, which applied to the attempted second-degree murder charge, stated that the defendant could use "deadly force" to defend herself if she "had reasonable grounds to believe and actually did believe that she was in danger of death or serious bodily harm" and that "deadly force was necessary to repel such danger." Likewise, Instruction No. 21, which applied to the aggravated assault charge, provided that a defendant "who is being assaulted" can legally "defend herself from attack if she has reasonable grounds for believing and does believe that bodily injury is about to be inflicted upon her." It is likely, given the language contained in the instructions, that the jury properly understood and applied them. See Watts v. State , 2016 WY 40, ¶ 25, 370 P.3d 104, 113 (Wyo. 2016) (we assume jury follows instructions given). While language clarifying standards for self-defense concepts related to the two different charges of aggravated assault and battery and attempted second-degree murder would be helpful on remand, the instructions as provided were not erroneous.
*1216 C. Did the district court err when it gave an instruction on the right to arm oneself in anticipation of an attack which was limited to situations of extreme danger?
[¶31] Ms. Widdison asserts error as to Instruction No. 22, which reads:
One who has reasonable grounds to believe that another will attack her, and that the anticipated attack will be of such a character as to endanger her life or limb, or to cause her serious bodily harm, has a right to arm herself for the purpose of resisting such attack.
If the defendant armed herself in reasonable anticipation of such an attack, that fact alone does not make the defendant the aggressor or deprive the defendant of the right to self-defense.
[¶32] Ms. Widdison argues that although the portion of this instruction that informs the jury that the fact a defendant arms herself does not make her the aggressor or deprive her of the right to self-defense is correct, the remainder of the instruction contravenes the Second Amendment because it limits a defendant's right to arm herself. The only case she cites in support of her argument is District of Columbia v. Heller , 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). In that case, the United States Supreme Court held unconstitutional a District of Columbia law banning handguns and prohibiting residents from keeping firearms in their home unless they were kept non-functional by the use of a trigger lock or other device. The Supreme Court explained that the Second Amendment protects the right to possess firearms and to use them for traditionally lawful purposes, including self-defense within the home. Id . at 574-626, 128 S.Ct. at 2788-2816.
[¶33] Contrary to Ms. Widdison's suggestion, Instruction No. 22 does not limit the right to bear arms. Rather, in its entirety, the instruction indicates that in the context of a defense of self-defense, arming oneself in anticipation of an attack does not render someone an aggressor. This is a correct and long-standing statement of the law in Wyoming. See , e.g. , Cavaness v. State , 358 P.2d 355, 357 (Wyo. 1961) ; Brown v. State , 80 Wyo. 12, 336 P.2d 794, 801 (Wyo. 1959) ; State v. Bristol , 53 Wyo. 304, 84 P.2d 757, 761 (Wyo. 1938). This does not mean that an individual does not have the right to arm herself at any other time, as Ms. Widdison would have us believe. We do not find that Instruction No. 22 was erroneous.
D. Did the district court err when it gave instructions regarding the first aggressor and the duty to retreat that did not clearly allocate the burden of proof and that have been held to constitute plain error?
[¶34] Next, Ms. Widdison claims that Instruction Nos. 25 and 26 were erroneous for several reasons-she argues that Instruction No. 25 should not have been given because the State did not assert that she was the first aggressor; she contends that Instruction No. 26 was erroneous because it did not set forth the burden of proof as to the first aggressor; and she claims that Instruction No. 26 was contrary to law because it stated that Ms. Widdison had an absolute duty to retreat.
[¶35] Instruction Nos. 25, 26, and 27 provided:
JURY INSTRUCTION NO. 25
In considering the claim of self-defense in this case, you must first determine whether the defendant was the aggressor in this case or whether Mr. Jones was the aggressor in this case. Some sort of physical aggression or a threat of imminent use of deadly force is required before a person will be considered an aggressor. Verbal provocation without more is generally insufficient to justify an initial aggressor. If you find the defendant was the aggressor in this case, you should consider her duty under Instruction No. 26. If you find that Mr. Jones was the aggressor, you should review the defendant's actions under Instruction No. 27.
INSTRUCTION NO. 26
Even if the defendant had reasonable ground to believe and actually did believe that she was in imminent danger of death or serious bodily harm, the defendant was justified in using deadly force to repel the danger only if she retreated as far as she *1217 safely could before using deadly force. The law requires a person to retreat rather than to take the life of an adversary if there was a convenient mode of retreat without increasing her actual or apparent peril. To excuse a failure to retreat, it is necessary that the defendant's peril would be increased, or that it reasonably appeared that it would be increased, by retreat. If you find that the defendant could have safely retreated but failed to do so, the defendant cannot rely on the justification of self-defense.
JURY INSTRUCTION NO. 27
Prior to resorting to deadly force a defendant has a duty to pursue reasonable alternatives under the circumstances. The defendant may use deadly force only if necessary, and must consider reasonable alternatives under the circumstances. The defendant may use deadly force only if necessary, and must consider reasonable alternatives, which may include retreat, before resorting to deadly force.
[¶36] Ms. Widdison claims that Instruction No. 25 was contrary to law in two respects. First, she contends that the requirement set forth in Drennen , 2013 WY 118, ¶ 39, 311 P.3d at 129, that the jury must first determine whether the victim or defendant was the aggressor, only applies in the situation where the prosecution asserts the defendant lost the right of self-defense by being the initial aggressor. She argues that here the prosecution never took the position that she acted in self-defense at all (and by implication never argued that Ms. Widdison was the first aggressor) and, as a result, the instruction did not apply. Because Ms. Widdison's position was that she acted in self-defense and Mr. Jones was the aggressor, the question of who was the first aggressor was at play. In Drennen , we held that "[i]n cases where the determination of which party was the aggressor is in dispute, the jury should be specifically instructed as to the definition of 'aggressor' so it can resolve the factual issue." Id . at ¶ 32, 311 P.3d at 127. Instruction No. 25 provided that definition and then correctly directed the jury to consider the defendant's duty based upon its determination as to who was the aggressor.
[¶37] Ms. Widdison also argues that Instruction No. 25 is erroneous because it lacks instruction on the burden of proof. To assert the theory of self-defense, the defendant first must present a prima facie case of each element of the affirmative defense. Drennen , 2013 WY 118, ¶ 39, 311 P.3d at 129. If the defendant carries this slight burden, the burden shifts to the State to prove that the defendant did not justifiably act in self-defense. Id. ; see also Schmuck v. State , 2017 WY 140, ¶ 69, 406 P.3d 286, 308 (Wyo. 2017). Because Ms. Widdison made a prima facie case of self-defense, Instruction No. 17 instructed the jury that "[b]efore the defendant may be convicted of any crime, the State must prove beyond a reasonable doubt that the defendant did not act in self-defense." "Instructions must be considered as a whole." Giles v. State , 2004 WY 101, ¶ 14, 96 P.3d 1027, 1031 (Wyo. 2004). We have cautioned that "individual instructions, or parts of them, should not be singled out and considered in isolation." Id. (citing Black v. State , 2002 WY 72, ¶ 5, 46 P.3d 298, 300 (Wyo. 2002) ). When we examine the instructions together, we conclude that Instruction No. 17 adequately informed the jury of the burden of proof. The State's burden to prove beyond a reasonable doubt that Ms. Widdison did not act in self-defense necessarily extended to proof of who acted as the first aggressor. Moreover, Ms. Widdison provides no law requiring the trial court to restate the burden when the jury is instructed regarding the determination of the first aggressor. Accordingly, even if it would have been clearer for the court to have done so, its failure to restate the burden in Instruction No. 25 was not contrary to law.
[¶38] Ms. Widdison next argues that Instruction No. 26 was erroneous because it is identical to the pattern instruction rejected in Drennen , 2013 WY 118, ¶ 37, 311 P.3d at 129 and in Haire , 2017 WY 48, ¶¶ 35-36, 393 P.3d at 1313.[4] We held in both cases *1218 that this instruction was "incorrect because it informed the jury that the defendant was required to retreat before using deadly force." Haire , ¶ 34, 393 P.3d at 1313 (internal quotation marks and citation omitted); see also Drennen , ¶¶ 37-39, 311 P.3d at 129-30. In Haire , we clarified that generally "there is no absolute duty of retreat; rather, the law requires that a person avoid using deadly force if there is a reasonable way to steer clear of it." Haire , ¶ 36, 393 P.3d at 1313. However, "when a person is the aggressor, he has 'a duty to withdraw or retreat before he could claim the right to self-defense.' " Id . (quoting Drennen , ¶ 39, 311 P.3d at 129 ).
[¶39] Instruction No. 25 directed the jury to only consider Instruction No. 26 if it found Ms. Widdison was the aggressor. Otherwise, the jury was instructed to review her actions in accordance with Instruction No. 27. This combination of instructions avoided the infirmity contained in Drennen and Haire because the jury was instructed to consider the duty to retreat only if it found Ms. Widdison to be the aggressor. Again, we find no error in this combination of instructions.
E. Did the district court err when it gave an incorrect malice definition?
[¶40] Instruction No. 34 stated:
The term "maliciously" means that the act constituting the offense was done intentionally but without premeditation, was reasonably likely to result in death and was done without legal justification or excuse or recklessly under circumstances manifesting an extreme indifference to the value of human life and was done without legal justification or excuse.
Ms. Widdison claims that this instruction was incorrect because it improperly uncoupled the language that maliciously means the act was "done intentionally but without premeditation, was reasonably likely to result in death" from the language that the act was "done recklessly under circumstances manifesting an extreme indifference to the value of human life, and that the act was done without legal justification or excuse." The State concedes that this instruction violated a clear and unequivocal rule of law.
[¶41] To properly instruct a jury regarding second-degree murder, the trial court must inform the jury that maliciously "means that the act constituting the offense was done recklessly under circumstances manifesting an extreme indifference to the value of human life, and that the act was done without legal justification or excuse." Wilkerson v. State , 2014 WY 136, ¶ 27, 336 P.3d 1188, 1200 (Wyo. 2014) (emphasis in original). Instruction No. 34 provides two correct statements of the law relating to second-degree murder-it provides the correct definition of maliciously and states that the act constituting the offense must be done intentionally but without premeditation. See Wyo. Stat. Ann. § 6-2-104 (LexisNexis 2017) (whoever "purposely and maliciously, but without premeditation, kills any human being is guilty" of second-degree murder). However, by joining those two statements by the disjunctive "or," the instruction incorrectly gave the jury a choice between two definitions of malice, one of which omitted the necessary concept of reckless indifference. We agree with the State that this violated the clear and unequivocal rule of law set forth in Wilkerson .
F. Did the district court err when it failed to provide definitions of "recklessly" and "recklessly under circumstances manifesting an extreme indifference to the value of human life"?
[¶42] Ms. Widdison next argues that the district court erroneously failed to provide *1219 definitions of "recklessly" and "recklessly under circumstances manifesting an extreme indifference to the value of human life." We considered the identical question in Schmuck , 2017 WY 140, ¶¶ 48-60, 406 P.3d at 301-05. There, we concluded that
"in order to demonstrate malicious intent [for second-degree murder], the State must show a heightened form of recklessness as compared to that required for manslaughter; i.e., the State must show that the defendant acted recklessly under circumstances manifesting an extreme indifference to the value of human life." [ Wilkerson v. State ,] 2014 WY 136, ¶ 27, 336 P.3d [1188,] 1200 [ (Wyo. 2014) ] ; see also Johnson [v. State ], 2015 WY 118, ¶ 18, 356 P.3d [767,] 772 [ (Wyo. 2015) ] (explaining that our definition of "malice" provided in Wilkerson does not apply to first-degree murder). We declined to adopt from O'Brien the preliminary step of providing the jury the definition of ordinary recklessness at Wyo. Stat. Ann. § 6-1-104(a)(ix). We stated that "this formulation [of extreme indifference to the value of human life] adequately distinguishes second-degree murder from manslaughter." Wilkerson , ¶ 27, 336 P.3d at 1200 ; see also O'Brien [v. State ], 2002 WY 63, ¶ 21, 45 P.3d [225,] 232 [ (Wyo. 2002) ] (citing Model Penal Code § 210.2 cmt. 4, at 25 ("[T]he point involved is put adequately and succinctly by asking whether the recklessness rises to the level of 'extreme indifference to the value of human life' ... [and] it seems undesirable to suggest a more specific formulation.") ).
Id . at ¶ 59, 406 P.3d at 305. As we held in Schmuck , the failure to define "recklessly" or "recklessly under circumstances manifesting an extreme indifference to the value of human life" does not transgress a clear and unequivocal rule of law. Id . at ¶ 60, 406 P.3d at 305. In Wilkerson , we "did not require a trial court to define 'recklessly' to the jury and stated that our formulation of heightened recklessness adequately distinguishes second-degree murder from manslaughter." Id . (citing Wilkerson , 2014 WY 136, ¶ 27, 336 P.3d at 1200 ).
II. Did the district court abuse its discretion when it prohibited testimony of specific instances of conduct relating to the victim's character for violence under W.R.E. 404(a)(2) and 405(b) ?
[¶43] Ms. Widdison claims that the district court abused its discretion when it interrupted and curtailed Mr. Norton's testimony regarding prior incidents of Mr. Jones' violent conduct. When Mr. Norton described a time when Mr. Jones barricaded Norton and Ms. Widdison in his basement while he paced upstairs with a gun, threatening to kill them, the following exchange occurred:
[DEFENSE COUNSEL]: Were firearms ever involved?
[MR. NORTON]: One time, there was. [Mr. Jones] discharged a firearm in his bedroom. Shot it through-he was sitting on his bed and shot-it shot through the bedroom or the bathroom in his bed-in his bedroom and to his closet.
[DEFENSE COUNSEL]: Was anybody in the house?
[MR. NORTON]: Yes, Misty was downstairs, sleeping.
And he-he pulled a gun on me once before. He'd-myself and Misty and Gene Smith were there and he was pacing around upstairs. We'd all just come from the bar. And he was upstairs, pacing around, yelling about he was going to kill anybody that was down in the basement. He barricaded us down there. He'd taken all of his-
THE COURT: Counsel-
[DEFENSE COUNSEL]: We're getting off-
THE COURT: -you need to approach the bench.
[DEFENSE COUNSEL]: Let me ask you a question.
THE COURT: Approach the bench.
(The following discussion was held at the bench.)
THE COURT: This needs to stop, [Defense Counsel].
[DEFENSE COUNSEL]: Okay.
*1220 THE COURT: This is all absolutely beyond the Rules of Evidence and you know it.
[DEFENSE COUNSEL]: Rule 405 allows-
[PROSECUTION]: Rule 405 doesn't allow-
THE COURT: Do not inject. I'm telling you, it does not. It's not relevant. If you need to set it up, you can set it up; and she can impeach it. You know, there's an opinion and there's an issue on an opinion and there's an issue on whether or not you've got a reputation and that's it.
[DEFENSE COUNSEL]: On 404, it is; but on 405, it uses specific instances of conduct and 608 uses specific instances of conduct.
THE COURT: This is far beyond everything. I'm telling you this needs to stop and you need to get to the point.
[DEFENSE COUNSEL]: Okay.
[¶44] The State concedes that the district court erroneously excluded the testimony, but argues that Ms. Widdison was not prejudiced by this error. See Hill v. State , 2016 WY 27, ¶ 22, 371 P.3d 553, 560 (Wyo. 2016) (when evidentiary rulings are found to be abuse of discretion, we inquire whether the defendant was prejudiced by the error); Toth v. State , 2015 WY 86A, ¶ 29, 353 P.3d 696, 705 (Wyo. 2015) (same). We agree that the testimony was admissible: Wyoming Rule of Evidence 405(b) allows "the accused in assault or homicide cases [to] introduce evidence of specific instances of the victim's conduct to prove that the victim was the first aggressor." W.R.E. 405, Supreme Court Note; see also Edwards v. State , 973 P.2d 41, 46 (Wyo. 1999) ; 1 Barbara E. Bergman et al., Wharton's Criminal Evidence § 4:23 (15th ed. updated 2017). The district court abused its discretion when it prohibited introduction of this evidence. However, we will not reach the question of whether Ms. Widdison was prejudiced by the error because we are remanding on other grounds.[5]
CONCLUSION
[¶45] The district court improperly resolved the disputed factual question of whether Ms. Widdison was a resident of Mr. Jones' home. Based upon its conclusion that Ms. Widdison was not a resident of his home, it declined to give Ms. Widdison's proposed castle doctrine instruction to the jury. Because the question of Ms. Widdison's residence was a factual one, it should have been submitted to the jury, along with appropriate instruction regarding the castle doctrine if the jury determined the home to be Ms. Widdison's residence. We reverse and remand for retrial, consistent with this opinion.

The rule that "a person is not required to retreat and may stand his ground and kill his assailant if he is assaulted, without fault, in this own home" is known as the "castle doctrine." Drennen v. State , 2013 WY 118, ¶ 24 and n.4, 311 P.3d 116, 125 and n.4 (Wyo. 2013).

The State urges us to follow this majority approach. Ms. Widdison's brief is silent on the issue, but she assumes that the castle doctrine applies to her because she claims error in the district court's failure to provide the instruction.

Neither party makes a distinction between the charges of aggravated assault and attempted second-degree murder with respect to the application of the castle doctrine instruction. We see no need to make such a distinction because the castle doctrine allows an individual who is in her own home to stand her ground and not retreat before using deadly force against her assailant. Haire , 2017 WY 48, ¶ 29, 393 P.3d at 1311-12 ; Drennen , 2013 WY 118, ¶ 24 n.4, 311 P.3d at 125 n.4 ; Flory , 276 P. at 462 ; Palmer , 59 P. at 795.

The instruction in Drennen and Haire provided:
Even if the defendant had reasonable ground[s] to believe and actually did believe that he was in imminent danger of death or serious bodily harm, the defendant was justified in using deadly force to repel the danger only if he retreated as far as he safely could do before using deadly force. The law requires a person to retreat rather than to take the life of an adversary if there was a convenient mode of retreat without increasing his actual or apparent peril. To excuse a failure to retreat, it is necessary that the defendant's peril would be increased, or that it reasonably appeared that it would be increased, by retreat. If you find that the defendant could have safely retreated but failed to do so, the defendant cannot rely on the justification of self-defense.
Drennen , ¶ 37, 311 P.3d at 129 ; Haire , ¶ 34, 393 P.3d at 1313.

Determining whether there had been prejudice in this case may well have been impossible. An offer of proof was required by W.R.E. 103(a)(2). However, defense counsel did not make an offer of proof with respect to what other information Mr. Norton (or the two additional witnesses) would have provided. "The dual purpose of an offer of proof is to alert the trial court to the nature of the error in order to allow corrective action, and at the same time to create a sufficient record for appellate review." Armstrong v. Hrabal , 2004 WY 39, ¶ 16, 87 P.3d 1226, 1232 (Wyo. 2004). "In the absence of an offer of proof showing the testimony that defense counsel hoped to elicit, we have no means of determining whether the error was prejudicial." Broussard v. State , 2017 WY 73, ¶ 21, 396 P.3d 1016, 1026 (Wyo. 2017) (citing Kovach v. State , 2013 WY 46, ¶ 96, 299 P.3d 97, 125 (Wyo. 2013) ).